*Nationstar Mortgage LLC d/b/a Mr. Cooper, as Successor by Merger to Nationstar, Inc., et. al. v. Donna Kemp*
No. 43, September Term 2020


**Mortgages – Assignment**.  As a general rule, if the person that originates a mortgage loan assigns the mortgage loan to another person, the assignee of the loan has the same rights and obligations under a deed of trust that secures that loan as the originator of the loan.

**Statutes – Statutory Interpretation – Code Revision – Maryland Usury Law**.  Code revision bills that re-codify existing statutes into new articles of the Maryland Code are not intended to change the substance of existing law.  The addition of a definition of "lender" to the Maryland Usury Law when that law was re-codified as part of the Commercial Law Article was not intended either to change the substance of the Maryland Usury Law or to abrogate the common law of assignment, particularly when the code revisors explicitly disclaimed any intention to change the law in the report to the General Assembly that accompanied the code revision bill.

**Maryland Usury Law – Prohibited Fees**.  The Maryland Usury Law restricts the assessment of an inspection fee against a borrower in connection with the financing of residential real property.  Maryland Code, Commercial Law Article, §12-121.  That prohibition applies during the life of a mortgage loan and applies to an assignee and a servicer of the mortgage loan, as well as to the originator of the loan.

**Consumer Finance – Debt Collection – Prohibited Practices**.  The Maryland Consumer Debt Collection Act, Commercial Law Article, §14-201 *et seq.*, prohibits a debt collector from engaging in certain conduct when "collecting or attempting to collect an alleged debt" based on a consumer transaction.  Among other things, a debt collector may not "claim … to enforce a right with knowledge that the right does not exist."  That prohibition is not limited simply to "methods" of debt collection.

**Consumer Finance – Debt Collection – Prohibited Practices – Statement of Cause of Action**.  The plaintiff's complaint alleged that the servicer of the plaintiff's mortgage asserted a right to collect property inspection fees from the borrower – fees that are prohibited by §12-121 of the Maryland Usury Law – and that the servicer had knowledge of that prohibition.  It adequately stated a claim based on a violation of the Maryland Consumer Debt Collection Act.

Circuit Court for Montgomery County
Case No. 441428V
Argument: March 5, 2021

IN THE COURT OF APPEALS
OF MARYLAND

No. 43

September Term, 2020

_____

NATIONSTAR MORTGAGE LLC D/B/A MR.
COOPER, ET AL.

V.

DONNA KEMP

_____

Barbera, C.J.,
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Opinion by McDonald, J.
Getty, J., dissents.
_____

Filed: August 27, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

A clever man once said that "cauliflower is nothing more than cabbage with a college education."[1]  It might be said, less cleverly, that code revision in Maryland – the process that restates statutes to make them more logical, accessible, and compatible with the English language – results in a new law that is nothing more than the old law with a college education.  At bottom, this case is about whether a code revision bill did more than that.

Some years ago, Respondent/Cross-Petitioner Donna Kemp entered into a mortgage loan secured by a deed of trust on her home.  The originator of that loan later assigned it to Petitioner/Cross-Respondent Federal National Mortgage Association ("Fannie Mae"), which contracted with the predecessor of Petitioner/Cross-Respondent Nationstar Mortgage, LLC ("Nationstar"), to service the loan – that is, to do such things as collecting and disbursing payments owed by the borrower.  Under longstanding Maryland law concerning the assignment of mortgages, Fannie Mae succeeded to the same rights and obligations of the original lender.

Ms. Kemp later fell behind on her mortgage payments.  After declaring her to be in default, Nationstar assessed Ms. Kemp fees for drive-by inspections of the property.  A provision of the Maryland Usury Law prohibits lenders from imposing such fees.  Ms. Kemp, Fannie Mae, and Nationstar entered into a loan modification agreement to resolve the default, but Ms. Kemp objected to the assessment of the property inspection fees.

---

[1] *See* Directory of Mark Twain's maxims, quotations, and various opinions at https://perma.cc/5G7U-56ZX**.**

Nationstar took the position that neither Fannie Mae, the assignee of the loan, nor its agent Nationstar, fit within a definition of "lender" that had been added to the Usury Law as part of code revision. Nationstar asserted that it was therefore exempt from the prohibition against property inspection fees. Ms. Kemp disagreed.

Ms. Kemp filed a complaint in the Circuit Court for Montgomery County and, after it was dismissed by the Circuit Court for failure to state a cause of action, pursued this appeal. The primary question in this appeal is whether the addition of a definition of "lender" to the Maryland Usury Law during code revision effected a significant change in that law – and the Maryland common law – that lay latent for more than four decades before this case arose.

We hold that code revision did not change Maryland law applicable to assignees of mortgage loans and that the prohibition on property inspection fees applies to Nationstar as the agent of Fannie Mae. We also hold, consistent with the principles announced in the Court's opinion in *Chavis v. Blibaum & Associates, P.A.*,[2] also issued today, that Ms. Kemp's complaint adequately stated a claim under the Maryland Consumer Debt Collection Act.

---

[2] 476 Md. 534 (2021).

# I

## Legal Background

*A.* *Financing Residential Real Property*

      1.      Mortgages

A mortgage is a device for securing a debt with real property. In a typical residential real estate transaction, in which a home buyer finances the purchase of a home through a mortgage, the buyer is the mortgagor and the lender is the mortgagee.

In Maryland, financing of residential real estate is typically accomplished when the home buyer executes a note promising to repay the loan to the lender and a deed of trust transferring an interest in the property to a trustee to secure that promise. Although a deed of trust may be technically distinct from a common law mortgage, it is common both colloquially and in legal parlance to use the term "mortgage" as a shorthand for financing that involves a deed of trust. *See Legacy Funding LLC v. Cohn*, 396 Md. 511, 513-14 n.1 (2007). For convenience, we will use that term on occasion in our opinion in this case, which arose from the financing of a home secured by a deed of trust.

A lender may designate a servicer to act as its agent in administering the mortgage. Typically, a servicer collects payments from the mortgagor on the debt and may take other actions such as the release of a lien and the payment of property insurance and property taxes. *See* Black's Law Dictionary (9th ed. 2009) at 1105 ("mortgage servicing"); *see also* Maryland Code, Financial Institutions Article, §11-501(n); Commercial Law Article, §13-316.

2.      Assignment of Mortgages

Like other loans, a mortgage may be assigned by the original lender to another person or entity.  A security instrument, like a mortgage or deed of trust, follows the debt instrument if the debt instrument is sold or negotiated to a different entity – that is, if the mortgage loan is assigned.  *See* Michael J. McKeefery & Richard E. Solomon, Gordon on Maryland Foreclosures (5th ed. 2021), ch. 4 & nn.1-2.  Any assignment or sale of a debt instrument after the initial transaction is said to take place in a secondary market.[3]

Mortgages are one of the oldest forms of secured debt to be assigned and sold in a secondary market.  Such a market has existed in England since at least the thirteenth century.  Jo Anne Bradner, *The Secondary Mortgage Market and State Regulation of Real Estate Financing*, 36 Emory L.J. 971, 974 (1987).[4]  Assignments of mortgages were well

---

[3] A "secondary market" is, in general, "any market in which participants deal in items which have seen their first sale elsewhere."  Jo Anne Bradner, *The Secondary Mortgage Market and State Regulation of Real Estate Financing*, 36 Emory L.J. 971, 973 (1987).

[4] It is important not to confuse the assignment of a mortgage, which is a secondary market transaction, with two other, more recent, types of transactions related to finance and residential real estate.

First, many homeowners obtain home equity loans or other forms of "second mortgages" on real property that is already subject to a first mortgage or similar prior encumbrance, often established in connection with the purchase of the property.  Second mortgages are regulated under the Maryland Secondary Mortgage Loan Law, Maryland Code, Commercial Law Article, §12-401 *et seq*.  Despite the title of that law, it concerns "*second* mortgages," not what has now come to be referred to as the "secondary mortgage market."  *See Thompkins v. Mountaineer Investments, LLC*, 439 Md. 118, 125 n.4 (2014).

Second, in recent years, many mortgages that have been assigned have been bundled in pools and securitized by financial intermediaries as an investment product.  The lack of adequate regulation of that phenomenon in recent decades triggered the Great Recession.

known under the common law in this country. Indeed, a century ago it was observed that "there is scarcely any business transaction that has been more common and familiar … than the assignment of mortgages." William E. Britton, *Assignment of Mortgages Securing Negotiable Notes*, 10 Ill. L. Rev. 337 (1915) (internal quotation marks and citation omitted).

In Maryland, it has long been understood that a mortgage may be assigned. Since at least 1856, the Maryland Code has provided specific direction on how to draft an instrument that assigns a mortgage. Chapter 154, ch. 4th, §§116, 117, Laws of Maryland 1856. That law is currently codified in Maryland Code, Real Property Article ("RP"), §4-203.

Under the common law, an assignee generally has the same rights and responsibilities as its assignor – no more, no less. For example, this Court recently stated:

> [T]he rights of an assignee are concomitant to those of an assignor … "An unqualified assignment generally operates to transfer to the assignee all of the right, title and interest of the assignor in the subject of the assignment and does not confer upon the assignee any greater right than the right possessed by the assignor."… [A]ssignees are "bound to the same limitations period as their assignor."

*University System of Maryland v. Mooney*, 407 Md. 390, 411 (2009) (citing and quoting *James v. Goldberg,* 256 Md. 520, 527 (1970) and *Jones v. Hyatt Ins. Agency, Inc.*, 356 Md. 639, 653 n.8 (1999)).

---

*See, e.g.*, Gretchen Morgenson & Joshua Rosner, Reckless Endangerment (2011). The recent trend of securitization at the behest of financial intermediaries is distinct from the assignment of a mortgage which, as indicated in the text, has been common for centuries.

The rights and responsibilities of an assignee of a mortgage are no different, as this Court has indicated. *See Kemp's Ex'x v. M'Pherson*, 7 H. & J. 320, 336 (1826) ("as a *general* rule no position is better established than that the assignee stands in the shoes of the assignor, and takes the claim, subject to all the equity it possessed in [the assignor's] hands") (emphasis in original); *Cumberland Coal & Iron Co. v. Parish*, 42 Md. 598, 614 (1875) ("the assignee takes the mortgage, and the debt secured by it, upon the same terms, and subject to the like equities and defences that it was subject to in the hands of the assignor"); *Farmers' & Merchants' National Bank v. Anderson*, 152 Md. 641, 645 (1927) (same); *Ressmeyer v. Norwood*, 117 Md. 320, 331-32 (1912) (same); *cf. In re Ward*, 2008 WL 508623 (Bankr. D. Md. Feb. 20, 2008) at *1 n.3 (under Maryland law, assignee of mortgage "stood in the shoes of [the assignor] with no more and no less rights than its assignor"); *see also* RP §2-103.[5]  As a general rule, an assignee of a mortgage acquires no power with respect to the mortgage that the assignor did not have. *Barrick v. Horner*, 78 Md. 253, 256 (1893) ("no theory can be maintained by which [the assignee of the mortgage], by merely succeeding to the rights of the mortgagee, could obtain a power which the latter never had").

---

[5] There is an exception to the general rule for an assignee who is a bona fide purchaser for value of a promissory note secured by a mortgage *who has no notice* of a defense or equity of the mortgagor.  That exception has no bearing on this case – as we shall see, a statute provides notice to the world.  However, this exception does reinforce that the general rule is that an assignee steps into the shoes of the assignor. *See* Part III.B.2 of this opinion below.

6

Beginning in the 1930s, in response to the Great Depression and in an effort to support home ownership, Congress created entities that either insure, guarantee, or purchase (*i.e.*, take assignment of) mortgage loans. Bradner, *supra*, 36 Emory L. J. at 975-77. Pertinent to this case, among those entities was the predecessor of the Federal National Mortgage Association, now commonly referred to as FNMA or Fannie Mae, which was created to buy and sell home mortgages. *Id.* at 975-77 & nn.16-25.[6] To facilitate the sale and assignment of mortgages, Fannie Mae has developed forms and guidelines for mortgages.

3.      The Maryland Usury Law

Maryland law has long regulated what a lender may charge a borrower in connection with a loan. The State Constitution establishes a legal rate of interest[7] and the General Assembly has legislated on the subject since colonial times.[8] *See generally Scott v. Leary*, 34 Md. 389 (1871) (recapping development of Maryland Usury Law beginning in 1704).

Once codified in a separate article of the Maryland Code – most recently, former Article 49 of the 1957 Code – the Maryland Usury Law now appears as Subtitle 1 of Title

---

[6] Some decades later, Fannie Mae was authorized to issue securities backed by the mortgages that it purchased. Bradner, *supra*, 36 Emory L. Rev. at 976 n.26.

[7] Maryland Constitution, Article III, §57 ("The Legal Rate of Interest shall be *Six per cent. per annum*; unless otherwise provided by the General Assembly.") (punctuation and italics in original).

[8] *E.g.*, Chapter 69, §1, Laws of Maryland 1704 at pp. 351-52 ("no person or persons whatsoever . . . shall exact or take directly or Indirectly for Loane of any Moneys, Wares, or Merchandizes or other Comoditys whatsoever to be paid in money above the value of Six pounds for the forebearance of one hundred pounds for one year . . . .").

12 of the Commercial Law Article ("CL"). The Usury Law defines "usury" as "the charging of interest by a lender in an amount which is greater than that allowed by this subtitle." CL §12-101(m). Other sections of the law regulate the amount of interest that may be charged. *See, e.g.*, CL §§12-101(k), 12-102, 12-103. However, since money is fungible and people are creative, efforts to circumvent the restrictions of the Usury Law have sometimes taken the form of fees or other charges that were assessed to the borrower. In *Brenner v. Plitt*, 182 Md. 348 (1943),[9] this Court rejected one such effort in colorful language restated from an earlier case:

> Usury is a moral taint wherever it exists and no subterfuge shall be permitted to conceal it from the eye of the law…. "[I]t matters not in what part of the transaction it may lurk, or what form it may take … or whether it be a pretended sale and lease, or under whatever guise the lender – always fruitful in expedients – may attempt to evade the law, Courts of justice, disregarding the shadow and looking to the substance, will ascertain what in truth was the contract between the parties."

182 Md. at 356-57 (quoting *Andrews v. Poe*, 30 Md. 485, 487-88 (1869)).

Consistent with this Court's statement in *Brenner*, the Maryland Usury Law covers not only the stated rate of interest, but also, in general, "any compensation" required by a lender "directly or indirectly" related to "the extension of credit for the use or forbearance of money," including "any loan fee, origination fee, service and carrying charge, investigator's fee, time-price differential, and any amount payable as a discount …." CL

---

[9] It appears from the Court's recitation of the facts in *Brenner* that the case involved a debt secured by a mortgage that had been assigned, although the precise time and terms of that assignment are not apparent from the Court's opinion.

§12-101(e) (definition of "interest"). Thus, various provisions of the Maryland Usury Law address fees or charges that may be imposed in connection with a loan.

Fees charged in connection with mortgages on residential real property have been a major concern of the General Assembly when addressing amendments to the Maryland Usury Law. In *B. F. Saul Co. v. West End Park North, Inc*., 250 Md. 707 (1968), this Court conducted a detailed analysis of various fees charged in connection with the financing of residential real property and the application of the Usury Law to those fees. The Court stated that "[i]n order to divine the legislative intent behind [a provision of the Usury Law], it is necessary to consider the primary objective sought to be achieved by the Act, which was to provide protection for the home buyer from sharp practices of some lenders." 250 Md. at 720. In analyzing a particular section of the Usury Law, the Court favored the "reading of the statute as a whole" rather than focusing solely on the particular section. *Id*. at 722. It emphasized that "[i]n ascertaining the intention of the legislature, all parts of a statute are to be read together to find the intention as to any one part, and all parts are to be reconciled and harmonized if possible." *Id*. In agreeing with the lower court's "practical and sensible" construction of an imprecise provision of the Usury Law, the Court reiterated the "cardinal rule[] of statutory construction … that wherever possible an interpretation should be given to the statutory language which will not lead to oppressive, absurd or unjust consequences." *Id*.

4.    CL §12-121

The primary issue in this case concerns the application of CL §12-121, a provision of the Maryland Usury Law that restricts the charging of an inspection fee in connection

with the financing of residential real property. That section, which was originally enacted in 1986,[10] reads as follows:

> (a)      In this section, the term "lender's inspection fee" means a fee imposed by a lender to pay for a visual inspection of real property.
>
> (b)      Except as provided in subsection (c) of this section, a lender may not impose a lender's inspection fee in connection with a loan secured by residential real property.
>
> (c) A lender's inspection fee may be charged if the inspection is needed to ascertain completion of:
> (1) Construction of a new home; or
> (2) Repairs, alterations, or other work required by the lender.
>
> (d) This section does not apply to an appraisal of the value of real property by a lender or to fees imposed in connection with an appraisal.

The key provision at issue in this case is the proscription in subsection (b) against the imposition of a "lender's inspection fee" in connection with a mortgage loan. Since at least January 2014, the Maryland Commissioner of Financial Regulation has taken the position that mortgage servicers like Nationstar are subject to the prohibition on inspection fees in CL §12-121 during the life of a mortgage loan. Advisory Notice (January 7, 2014), available at https://perma.cc/2WYR-S22S.

## B.      Debt Collection – Maryland Consumer Debt Collection Act

Also at issue in this appeal is the application of another consumer protection statute codified in the Commercial Law Article – the Maryland Consumer Debt Collection Act

---

[10] Chapter 628, Laws of Maryland 1986.

("MCDCA"). CL §14-201 *et seq.* The MCDCA regulates the conduct of anyone who collects – or attempts to collect – a debt arising from a consumer transaction. A consumer transaction is defined as a "transaction involving a person seeking or acquiring real or personal property, services, money, or credit for personal, family, or household purposes." CL §14-201(c). During the period pertinent to this case,[11] the statute provided that a "[debt] collector may not:"

(1) Use or threaten force or violence;

(2) Threaten criminal prosecution, unless the transaction involved the violation of a criminal statute;

(3) Disclose or threaten to disclose information which affects the debtor's reputation for credit worthiness with knowledge that the information is false;

(4) Except as permitted by statute, contact a person's employer with respect to a delinquent indebtedness before obtaining final judgment against the debtor;

(5) Except as permitted by statute, disclose or threaten to disclose to a person other than the debtor or his spouse or, if the debtor is a minor, his parent, information which affects the debtor's reputation, whether or not for credit worthiness, with knowledge that the other person does not have a legitimate business need for the information;

(6) Communicate with the debtor or a person related to him with the frequency, at the unusual hours, or in any other manner as reasonably can be expected to abuse or harass the debtor;

(7) Use obscene or grossly abusive language in communicating with the debtor or a person related to him;

---

[11] In 2018, the statute was amended to add two additional prohibited practices – engaging in unlicensed debt collection activity and violating the federal Fair Debt Collection Practices Act. Chapters 731, 732, Laws of Maryland 2018.

11

(8) Claim, attempt, or threaten to enforce a right with knowledge that the right does not exist;

(9) Use a communication which simulates legal or judicial process or gives the appearance of being authorized, issued, or approved by a government, governmental agency, or lawyer when it is not.

CL §14-202. The provision most pertinent to this case is subsection (8) concerning a debt collector's assertion of a right "with knowledge that the right does not exist." A debt collector who violates the MCDCA is liable for damages caused by the violation. CL §14-203. A violation of the MCDCA is also defined to be an "unfair and deceptive trade practice" prohibited by the Maryland Consumer Protection Act. CL §§13-301(14)(iii), 13-303.

## II

## Facts and Proceedings

This case was decided in the Circuit Court on the basis of a motion to dismiss the complaint. In reviewing that ruling, we accept the well-pleaded allegations of the complaint as true. The Second Amended Complaint is the operative pleading for that purpose. We summarize the facts that are alleged in the Second Amended Complaint or that otherwise appear to be undisputed.

### A.    *Ms. Kemp's Mortgage*

1.    Origination and Assignment of Mortgage

In April 2007, Ms. Kemp refinanced her home in Glen Burnie and for that purpose executed a deed of trust in favor of the lender, Countrywide Home Loans, Inc. ("Countrywide"), to secure the mortgage loan she received from Countrywide. The deed

12

of trust was drafted and executed on a Fannie Mae form. The fine print of the 12-page

form addressed various terms of the deed of trust. Paragraph 14 of the deed of trust, entitled

"Loan Charges," stated:

> **Lender may charge Borrower fees for services performed in connection with Borrower's default**, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, **including**, but not limited to, attorneys' fees, **property inspection** and valuation **fees**. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. **Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.**

(emphasis added).

At some point after execution of the deed of trust, the mortgage loan and the deed

of trust that secured it were acquired by Fannie Mae.[12] The land records for Anne Arundel

County reflected an assignment of the deed of trust to Fannie Mae. Fannie Mae contracted

with a predecessor entity of Nationstar to service the loan on Fannie Mae's behalf.[13]

---

[12] The time and precise mechanism of the assignment are not alleged in the complaint or otherwise clear from the record.

[13] The predecessor entity, known as Seterus, merged with Nationstar in February 2019, with Nationstar as the surviving entity. Ms. Kemp originally named Seterus as a defendant in her complaint, and Nationstar was subsequently substituted for Seterus as a defendant. For ease of reference, in this opinion we will refer to "Nationstar" as the servicer of Ms. Kemp's mortgage.

2.      Default, Inspection Fees, and Loan Modification

*Ms. Kemp Defaults*

In 2017, Ms. Kemp fell behind on her mortgage payments.  On April 10, 2017, Nationstar declared the mortgage to be in default and threatened foreclosure if she did not cure the default.[14]

*Communications Concerning Nationstar's Property Inspection Charges*

On or about July 14, 2017, Ms. Kemp asked Nationstar for certain information about her mortgage.  On or about July 24, 2017, Nationstar replied and disclosed to Ms. Kemp for the first time that her account had been charged "property preservation charges from August 26, 2016 through July 24, 2017."

On September 6, 2017, Ms. Kemp asked Nationstar for more information regarding the property preservation charges.  Nationstar replied on September 25, 2017, stating that Ms. Kemp owed $180 in property inspection fees that would be included as part of the payoff total for her mortgage.  Another letter by Nationstar, dated September 26, 2017, stated that the deed of trust authorized it to conduct property inspections and to charge related fees when an account is more than 45 days delinquent, and every 30 days thereafter if the delinquency continues, to verify that the property is occupied and in good repair.

---

[14] Ms. Kemp's personal liability on the loan had been extinguished in 2011 as a result of a discharge in bankruptcy.  Her home remained subject to the terms of the deed of trust.

14

*Loan Modification*

In the meantime, in a letter dated July 20, 2017, Nationstar, on behalf of Fannie Mae, had offered Ms. Kemp a trial loan modification plan that required her to make three payments at the beginning of September, October, and November 2017. Ms. Kemp accepted the trial plan and made the payments required by the trial plan.

On November 8, 2017, Nationstar, on behalf of Fannie Mae, offered Ms. Kemp a loan modification. The loan modification agreement, which was drafted by Nationstar on behalf of Fannie Mae, identified Fannie Mae as the "lender." Ms. Kemp agreed to the loan modification in the belief that the offer included only amounts that Nationstar was lawfully entitled to charge. However, the loan modification agreement had capitalized the property inspection fees into the mortgage principal.[15]

## B.      *Litigation Concerning the Property Inspection Fees*

### 1.      Complaint

In December 2017, Ms. Kemp filed a complaint against Fannie Mae and Nationstar in the Circuit Court for Montgomery County. The complaint, as amended a month later, included one count under the federal Truth in Lending Act, 15 U.S.C. §1601 *et seq.,* and five counts based on State law, including CL §12-121 and the MCDCA. Each count of the

---

[15] Nationstar apparently had a practice of imposing inspection fees in connection with the mortgages it serviced in Maryland through another of its subsidiaries. Subsequent to the events in this case, it entered into an Assurance of Discontinuance with the Consumer Protection Division in which it agreed to cease and desist from assessing such fees and to make restitution of fees assessed with respect to those mortgages. *Consumer Protection Division v. Nationstar Mortgage LLC* (May 14, 2018).

complaint was based on the contention that Fannie Mae, and Nationstar as its agent, were prohibited from assessing the property inspection fees against Ms. Kemp. The complaint sought to have the case certified as a class action on behalf of other similarly situated borrowers.

Some counts of the complaint alleged claims against both Fannie Mae and Nationstar; other counts asserted a claim against only one of the defendants.[16] During the course of this litigation Fannie Mae and Nationstar have been represented by the same counsel, who have made the same filings and arguments on behalf of both. Because the allegations of the complaint are based on actions that Nationstar took as servicer of Ms. Kemp's loan on behalf of Fannie Mae, for ease of reference we will refer to Nationstar in the remainder of this opinion when discussing filings and legal arguments made on behalf of both defendants in the complaint – who are also the Petitioners and Cross-Respondents

---

[16] Count I sought declaratory and injunctive relief against both Fannie Mae and Nationstar with respect to collection of property inspection fees. Count IV sought statutory damages from both Fannie Mae and Nationstar with respect to those fees under CL §12-114 of the Maryland Usury Law.

The other three counts alleging State law violations were brought against Nationstar alone. Count II asserted a claim of unjust enrichment with respect to past collections of property inspection fees. Count III asserted a claim under the MCDCA and Maryland Consumer Protection Act with respect to the property inspection fees. Count V alleged that the assessment of the property inspection fees violated the Maryland Mortgage Fraud Protection Act, Maryland Code, Business Regulation Article, §7-401 *et seq*.

The claim in Count VI under the federal Truth in Lending Act was asserted against both Fannie Mae and Nationstar or alternatively, if the court were to determine that Fannie Mae was the only appropriate defendant under that law, against Fannie Mae alone.

16

in this appeal. We will refer to them individually only when the discussion involves a distinction between their capacities as assignee (Fannie Mae) and servicer (Nationstar).

### 2. Removal to Federal Court and Remand

Nationstar removed the case to the United States District Court for the District of Maryland, where Ms. Kemp filed the Second Amended Complaint, which included the same counts as the prior amended complaint. The federal court granted Nationstar's motion to dismiss the federal law claim and remanded the State law claims to the Circuit Court.

### 3. Dismissal of State Law Claims

Once back in the Circuit Court, Nationstar moved in July 2018 to dismiss the State law claims. Following a hearing on September 13, 2018, the Circuit Court granted Nationstar's motion to dismiss in a Memorandum and Order dated October 19, 2018.[17] The Circuit Court concluded that neither Fannie Mae nor Nationstar was subject to the prohibition in CL §12-121 because neither fit the definition of "lender" in CL §12-121(f). Accordingly, it dismissed the State law claims of the complaint. In addition, the court reasoned that the letters sent by Nationstar to Ms. Kemp were not attempts to collect a debt and thus were not within the purview of the MCDCA.[18]

---

[17] The Memorandum and Order mistakenly cites the Secondary Mortgage Loan Law and a case interpreting that law, illustrating how the title of that law can mislead even a sophisticated reader. Memorandum and Order at 6 n.4; *see* footnote 4 above. However, that erroneous reference did not affect the substance of the Circuit Court's reasoning.

[18] The Circuit Court also held that, to the extent Ms. Kemp alleged a claim under the Maryland Consumer Protection Act, it was purely derivative of her claim under the

4.      Appeal

Ms. Kemp appealed.  The Court of Special Appeals reversed the rulings of the Circuit Court in part and affirmed them in part.  248 Md. App. 1 (2020).

After examining CL §12-121, its context in the Maryland Usury Law, the legislative history of that law, and related Maryland case law, the Court of Special Appeals concluded that the prohibition against inspection fees in CL §12-121 applies to an assignee of a mortgage loan.  Accordingly, the intermediate appellate court reversed the Circuit Court's dismissal of Ms. Kemp's claims to the extent that the ruling was based on the premise that CL §12-121 did not apply to Fannie Mae or its servicer, Nationstar.[19]  248 Md. App. at 19-28.

However, the Court of Special Appeals affirmed the Circuit Court's dismissal of the claim under the MCDCA, based on different reasoning than that of the Circuit Court. Relying on its prior decisions applying the MCDCA in *Chavis v. Blibaum Associates, P.A.*, 246 Md. App. 517, 529 (2020), *cert. granted*, 471 Md. 100 (2020), and *Allstate Lien & Recovery Corp. v. Stansbury*, 219 Md. App. 575, 591 (2014), *aff'd on other grounds*, 445 Md. 187 (2015), the intermediate appellate court concluded that dismissal of the MCDCA claim was appropriate on the theory that MCDCA prohibits the use of an illegal "method"

MCDCA.  In addition, the court held that the complaint lacked the requisite particularity to state a claim under the Maryland Mortgage Fraud Prevention Act.

[19] The intermediate appellate court also reversed the Circuit Court's dismissal of the unjust enrichment claim and the claim under Maryland Mortgage Fraud Prevention Act to the extent those rulings were based on an apparent fact finding by the Circuit Court inconsistent with the record and procedural posture of the case.  248 Md. App. at 29-30.

18

of debt collection, but does not provide a vehicle for attacking the validity of the underlying debt.[20]  248 Md. App. at 31-38.

We subsequently granted Nationstar's petition for a writ of *certiorari* and Ms. Kemp's cross-petition.

**III**

**Discussion**

To resolve this appeal, we must answer the following questions:

(1) Does CL §12-121 apply to an inspection fee charged by an assignee of a mortgage?

(2) Did the complaint adequately allege that Nationstar attempted to collect an alleged debt by asserting a right to collect inspection fees with knowledge that the right did not exist, in violation of the MCDCA?

*A.*     ***General Principles Governing Appellate Review***

1.     Standard of Review of Dismissal of Complaint

When deciding whether to grant a motion to dismiss a complaint as a matter of law, a trial court is to assume the truth of factual allegations made in the complaint and draw all reasonable inferences from those allegations in favor of the plaintiff.  *Ceccone v. Carroll*

---

[20] The Court of Special Appeals did not address the question whether Ms. Kemp's complaint adequately stated a stand-alone claim under the Maryland Consumer Protection Act, on the basis that she had not made that argument in the Circuit Court.  248 Md. App. at 38-39.  It also affirmed the Circuit Court's ruling that she had failed to state her claim under the Maryland Mortgage Fraud Prevention Act with sufficient particularity.  *Id*. at 39-43.  Neither of those issues is before us in this appeal.

19

*Home Services, LLC*, 454 Md. 680, 691 (2017). When an appellate court reviews a trial court's grant of a motion to dismiss, the appellate court applies the same standard to assess whether the trial court's decision was legally correct. *Id.* Because the resolution of the motion to dismiss turns on a question of law, appellate review is *de novo*, without any special deference to the trial court. *Id.* The questions of law at issue in this appeal involve the interpretation of two statutes – the Maryland Usury Law and the MCDCA.

2.      Principles of Statutory Interpretation

The goal of statutory interpretation is to "ascertain and effectuate the real and actual intent of the Legislature." *Gardner v. State*, 420 Md. 1, 8 (2011). We begin with an examination of the text of a statute within the context of the statutory scheme to which it belongs. *Aleman v. State*, 469 Md. 397, 421, *cert. denied*, 141 S. Ct. 671 (2020). Review of the text does not merely entail putting the words under the microscope by themselves with a dictionary at hand, because words that appear "clear and unambiguous when viewed in isolation" may "become ambiguous when read as part of a larger statutory scheme." *Fisher v. Eastern Correctional Institution*, 425 Md. 699, 707 (2012). A particular section of a statute must be construed in a manner consistent with the larger statute's object and scope. *Blackburn Ltd. P'ship v. Paul*, 438 Md. 100, 122 (2014). We also review the legislative history of the statute to confirm conclusions drawn from the text or to resolve ambiguities. In addition, we examine prior case law construing the statute in question. *Aleman*, 469 Md. at 421. Finally, it is important to consider the consequences of alternative interpretations of the statute, in order to avoid constructions that are "illogical or

20

nonsensical, or that render a statute meaningless." *Couret-Rios v. Fire & Police Employees' Retirement System*, 468 Md. 508, 528 (2020).

**B.       *Whether CL §12-121 Applies to the Fees Charged by Nationstar***

           1.       Prohibition of Inspection Fees in CL §12-121

The relevant provision of CL §12-121 prohibits the imposition of a "lender's inspection fee" in connection with a mortgage loan, except in limited circumstances. CL §12-121(b). The statute defines "lender's inspection fee" as "a fee imposed by a lender to pay for a visual inspection of real property." CL §12-121(a).

CL §12-121 was added, with several other provisions, to the Usury Law in 1986. Chapter 628, Laws of Maryland 1986. The impetus for that bill was the perception that closing costs for sales of real property in Maryland were high relative to those in other states. To deal with that problem, in 1985 the Governor appointed a Task Force on Real Property Closing Costs. Report of the Task Force on Real Property Closing Costs (January 1986) at pp.1-4. One of the Task Force's recommendations was that certain inspection fees often imposed in connection with mortgage loans be limited to circumstances in which such inspections were truly necessary. *Id*. at 33-34 (Task Force Recommendation No. 7).

The Task Force's report resulted in various amendments to the Usury Law, including CL §12-121. Although the bill was largely targeted at fees imposed at the origination of a mortgage loan, CL §12-121 and certain other provisions added by the 1986

law apply during the life of the loan.[21] Nothing in the Task Force's report, or the legislation that resulted from it, indicated an intent to abrogate the common law rule that an assignee of a loan steps into the shoes of its assignor.

Nationstar does not argue that the type of inspection fee that it allegedly charged Ms. Kemp falls within a statutory exemption in CL §12-121 or is otherwise beyond the purview of the statute.[22] Rather, Nationstar argues that *it* is exempt from CL §12-121 because, as the agent of Fannie Mae, the assignee of Ms. Kemp's mortgage loan, it was not acting on behalf of a "lender" prohibited from charging such fees.

2.      Nationstar's Asserted Justification for Charging Inspection Fees

In its correspondence with Ms. Kemp, in its argument in the Circuit Court, and in this appeal, Nationstar has pointed to paragraph 14 of the deed of trust as its authority to charge property inspection fees.[23] That provision reads in pertinent part: "Lender may charge Borrower fees for services performed in connection with Borrower's default … including, but not limited to, … property inspection … fees…. Lender may not charge fees that are expressly prohibited … by Applicable Law." The phrase "Applicable Law" is defined to include state statutes, among other laws. CL §12-121, which prohibits the

_____

[21] *See Taylor v. Friedman,* 344 Md. 572 (1997), discussed in Part III.B.5 of this opinion.

[22] Nationstar conceded at the hearing in the Circuit Court that the statutory exceptions to the prohibition on inspection fees do not apply to this case.

[23] The provision is quoted in full in Part II.A.1 of this Opinion. As indicated there, this deed of trust is on a Fannie Mae form.

22

collection of property inspection fees by a "lender," is such a state statute. Nationstar has conceded that, under paragraph 14, the original "lender" – Countrywide – was thus not authorized to charge a property inspection fee under paragraph 14 of the deed of trust.

In Nationstar's view, when Countrywide assigned the deed of trust to Fannie Mae, Fannie Mae became the "lender" under the deed of trust and specifically acquired the "lender's" rights to charge fees as provided by paragraph 14 of that instrument. Nothing in the deed of trust itself recognizes that an assignee of the "lender" succeeds to the right to charge fees, as authorized and limited by paragraph 14, so it must occur by virtue of the common law rule.[24] Nationstar thus relies on the common law rule concerning assignment of mortgages to conclude that Fannie Mae is a "lender" under the deed of trust and authorized to charge fees under paragraph 14 as its basis for charging an inspection fee in this case. However, in Nationstar's view, Fannie Mae is not a "lender" for purposes of the statutory restrictions on fees charged by a "lender" that are also incorporated in paragraph 14.

Nationstar's position that Fannie Mae succeeded to the authorization, but not the limitations, on the assessment of fees in paragraph 14, is primarily based on its reading of CL §12-101(f), the general definition of "lender" in the definition section of the Maryland Usury Law.

---

[24] The term "lender" is defined in the deed of trust to mean Countrywide; there is no mention in that document of an assignee of the "lender" in general or of an assignee of Countrywide in particular.

### 3. CL §12-101(f) – Definition of "Lender"

*Statutory Text*

During the relevant period, CL §12-101(f) defined "lender" as "a person who makes a loan under this subtitle."[25]  The "subtitle" referenced in that definition is the Maryland Usury Law.  Noting the reference to making a loan and the absence of the word "assignee" in CL §12-101(f), Nationstar argues that CL §12-121 – which is also part of the Maryland Usury Law – does not apply to an assignee of a mortgage loan – or at least not to Fannie Mae.[26]  In accordance with our approach to statutory construction, we look to the context of the statutory scheme of which CL §12-101(f) is a part – the Maryland Usury Law.

---

[25] The conduct at issue in this case occurred prior to a 2018 amendment of CL §12-101(f).  As a result of that amendment, the statute now defines "lender" as "a licensee or a person who makes a loan subject to this subtitle."  Financial Consumer Protection Act of 2018, Chapters 732, 790, Laws of Maryland 2018.  A definition of the term "licensee," also added by the 2018 amendments, encompasses anyone required to be licensed to make loans subject to the Usury Law, whether or not the person is actually licensed.  CL §12-101(g).  The substitution of the phrase "subject to this subtitle" for "under this subtitle" at the end of the definition of "lender" appears to be stylistic in nature.

[26] Nationstar has argued that CL §12-121 generally does not apply to *any* assignee of a mortgage loan based on the definition of "lender" in CL §12-101(f).  *See* Brief of Petitioners/Cross-Respondents at 2 ("Section 12-121's plain language therefore does not include a mortgage purchaser …"); *id.* at 14-17, 23-24; Reply Brief of Petitioners/Cross-Respondents at 2 ("Section 12-101(f)'s Definition of 'Lender' Does Not Include Mortgage Assignees Or Servicers").

However, at times in its briefs and at oral argument, Nationstar appeared to make a narrower claim – (1) that an assignee of a mortgage loan *could* be covered by the definition in CL §12-101(f) if it otherwise originated a loan (*i.e.*, "made" a loan, in Nationstar's view) at some time to someone else but (2) that Fannie Mae would never fall into that category because it is prohibited by federal law from originating loans under 12 U.S.C. §1719(a)(2).  Nationstar never fully articulates that narrower argument, perhaps because the notion that an assignee would qualify as a "lender" for a particular loan simply because it happened to

24

*Statutory Context*

The Legislature's use of the word "lender" in the Maryland Usury Law is not limited to CL §12-121. The term "lender" is used throughout that law in specifying restrictions that the Usury Law sets on the terms of loans of money, not just mortgage loans.[27] In some parts of the subtitle, that word is used in provisions that regulate the lending entity's conduct before or when the loan is extended. CL §12-106(b), for example, requires the "lender" to furnish to "the borrower" a written statement with specified information before the loan contract is executed. Similarly, CL §12-127(b) specifies matters that the "lender" must consider before making a mortgage loan. These provisions clearly focus on persons who originate (or are about to originate) a loan. Thus, for these particular provisions, reading "lender" to include only the originator of a loan would not be inconsistent with the Legislature's intent to regulate a lending entity's conduct at the origination stage.

Other parts of the Usury Law, however, clearly regulate conduct that occurs later in the life of the loan. They also use the term "lender." CL §12-126(c), which applies when a borrower prepays a loan before the expiration of the term of the loan, requires the "lender" to give the borrower a refund or credit for the unearned portion of precomputed interest. CL §12-105(d) prohibits a "lender" from imposing a penalty or other charge on borrowers

---

have originated ("made") a loan to someone at some other time unrelated to the transaction in question seems illogical.

[27] As the Court of Special Appeals recounted, numerous other provisions of the Usury Law regulate the actions of a "lender." *E.g.*, CL §12-108 (charging of points); CL §12-113 (anti-discrimination provision); CL §12-124 (insurance required of borrower); CL §12-126 (pre-payment penalty). *See* 248 Md. App. at 15-17.

who prepay their mortgages. CL §12-109.1 sets forth the process that a "lender" or "servicer" must follow if it determines that the borrower must increase escrow payments under a first mortgage or deed of trust. CL §12-115 regulates a "lender's" repossession of goods that secure a loan. CL §12-106(c) generally requires a "lender" to provide the borrower with annual statements of payments made and principal amounts due on residential real property loans. These provisions, which appear to apply over the life of a loan, suggest that the term "lender" includes not only an originator of a loan but also an assignee.

Thus, whether the term "lender" in CL §12-101(f) is limited to the originator of a mortgage loan or also encompasses an assignee of the originator is at best unclear; viewed in the context of its usage throughout the Usury Law, the term is ambiguous. We therefore consider the legislative history of the Maryland Usury Law to discern the "real and actual intent" of the Legislature.

*Legislative History of CL §12-101(f)*

As recounted earlier, the Maryland Usury Law has a long lineage dating back to colonial times. For centuries, the Usury Law had not included a specific definition of "lender." But, as outlined earlier, it was clear that the Usury Law regulated the conduct of a person who was assigned a loan, not just the originator of the loan – presumably on the well-accepted principle that an assignee succeeded to the rights and obligations of its assignor with respect to the loan. Indeed, since at least 1824, the Maryland Usury Law has included a section that relieved an assignee of liability under that law if the assignee took the assignment for bona fide and legal consideration without notice of the violation of that

26

law.  *See* Chapter 200, Laws of Maryland 1824, *codified as revised at* CL §12-112.  The clear implication of that provision – consistent with the common law – is that an assignee who takes an assignment *with notice* of a restriction under the Usury Law is subject to such liability.[28]  *See Thompkins v. Mountaineer Investments, LLC*, 439 Md. 118, 132 n.12 (2014); *Arrington v. Colleen, Inc.*, 2001 WL 34117735 at *9 (D. Md. 2001).

The definition of "lender" in CL §12-101(f) was first added to the Maryland Usury Law as part of a new definitions section of that law when the Usury Law was re-codified as part of code revision in 1975 into the then-new Commercial Law Article.[29]  Chapter 49, §3, Laws of Maryland 1975.  As is generally the case in code revision, the Commission that drafted the re-codified law did not intend to make any substantive change to the existing Usury Law and so informed the General Assembly in its report.  Specifically, the Commission stated that the recodification of the Usury Law in CL §12-101 *et seq.* was "designed to clarify, but not change, the existing law."  Commission Report No. 1975-1 of the Governor's Commission to Revise the Annotated Code at p. 16.  The recodification took into account the interpretations of that law in the decisions of this Court and in the published opinions of the Attorney General.  *Id.*  A few years later, this Court confirmed that the recodification of the Maryland Usury Law as part of the Commercial Law Article

---

[28] In this regard, it cannot be said that an assignee lacks notice of a statutory restriction incorporated in a loan agreement.

[29] The opinion of the Court of Special Appeals in this case contains an excellent summary of the provisions of the Usury Law and its placement among various other consumer finance laws as a separate subtitle in Title 12 of the Commercial Law Article. *See* 248 Md. App. at 14-19.

did not affect the substance of that law. *Hoffman v. Key Federal Savings & Loan Ass'n*, 286 Md. 28, 37, 42-43 (1979).

Given that the recodification with the new general definitions section of the Usury Law was not intended to change that law, it is evident that the code revisors included a definition of "lender," as well as of certain other terms, in an effort to *avoid* making what might otherwise appear to be substantive changes in one of the various consumer finance laws included in the new Commercial Law Article. The Revisor's Notes to the definitions sections in the code revision bill bear this out. For example, the Revisor's Note to the new definition of "lender" in CL §12-101(f) states that "[t]his subsection is new language added to indicate that, in this subtitle [*i.e.*, the Maryland Usury Law], the term "lender" relates only to a person who lends money *under the provisions of this subtitle and not, for example, under any other credit law*." Chapter 49, §3, Laws of Maryland 1975 at p. 378 (emphasis added). Thus, the addition of this definition to the Usury Law was the code revisors' effort to ensure that a law once isolated in its own article of the code (former Article 49) would reside without unnecessary confusion in proximity to other laws in the new Commercial Law Article that used the same term for different purposes.[30] Otherwise, the definition of

---

[30] In general, each of the 36 articles of the most recent revision of the Maryland Code begins with a section that sets forth definitions that apply across multiple titles of the particular article of the code. The Commercial Law Article is one of three that does not (the others are the Courts & Judicial Proceedings Article and the Natural Resources Article). Presumably, this is because the code revisors elected to devote Titles 1 through 10 of the Commercial Law Article to the Maryland version of the Uniform Commercial Code, a model law adopted by most states that consists of 10 titles, and thus avoid a nightmare for future generations of Maryland lawyers if the numbering systems did not correlate to the uniform code. (The Courts & Judicial Proceedings Article and the Natural

"lender" in CL §12-101(f) – "a person who makes a loan under this subtitle" – is tautological, much like the definition of "borrower" that was also added by the revisors. *See* CL §12-101(b) ("a person who borrows money under this subtitle"). From the revisors' perspective, the key words in both of those definitions were "under this subtitle" as that phrase made clear that those who were regulated or benefited by the Usury Law as recodified were the same as before the recodification.[31]

*Consequences of Nationstar's Interpretation for the Usury Law*

If Nationstar's argument is correct, the Legislature quietly made two very significant substantive changes to both the Usury Law and the common law during code revision in 1975 when it added the "lender" definition to the Usury Law: First, under Nationstar's argument, the Legislature implicitly abrogated the longstanding common law rule that an assignee of a loan succeeds to the same rights and limitations as its assignor – in the case of an initial assignment, the person who originated the loan. Second, it implicitly exempted an assignee of *any* loan from *most* of the restrictions of the Usury Law.

As to whether the Legislature's adoption of the "lender" definition implicitly abrogated the common law on assignments, it is a standard canon of statutory construction

---

Resources Article, the first two articles created as a result of code revision, were both enacted in 1973 before a style manual had been developed for the project).

[31] This is also made evident by the fact that the code revisors included identical definitions of "lender" for other laws recodified in the Commercial Law Article. However, in each of those definitions, the identical phrase "under this subtitle" carried a different meaning because it referred to a different finance law. *See, e.g.*, CL §12-201(b) (1975) (defining "lender" for purposes of the Maryland Small Loan Law); CL §12-301(c) (1975) (defining "lender" for purposes of the Maryland Consumer Loan Law).

29

that statutes are not construed to repeal the common law by implication. *See United Bank v. Buckingham*, 472 Md. 407, 433 (2021) ("It is a generally accepted rule of law that statutes are not presumed to repeal the common law further than expressly declared[.]"); *State v. North*, 356 Md. 308, 311-12 (1999) (although the General Assembly may abrogate the common law, a repeal will not be implied unless "plainly pronounced"). There is no indication in the legislative history of the 1975 code revision of any intention to change the common law rule on assignment of a loan, much less an intention that was "plainly pronounced." Nor is there any indication of a legislative purpose behind such a change – for example, that the Legislature thought that borrowers of loans that had been assigned were in any less need of protection than borrowers whose loans remained with the original lending entity. Given the ease and frequency with which loans are assigned – and have long been assigned in Maryland – it is very unlikely that the Legislature intended to change the common law so substantially without making such a purpose clear.

Similarly lacking is any indication that the Legislature intended to narrow the scope of the Usury Law by inserting a gaping loophole in those provisions that use the term "lender" in the context of post-origination conduct. The consequences that would follow from Nationstar's proposed interpretation of CL §12-101(f) with respect to mortgage loans include the following:

● *Prepayment credits*. A homeowner who prepays a mortgage loan would be entitled to a refund or credit of the unearned portion of the precomputed interest charge

30

only from the originator of the mortgage but not from an assignee.[32] In this case, if Ms. Kemp prepaid the mortgage after its assignment, she would have to look to Countrywide for a refund, not to Nationstar.

● *Prepayment penalties.* A homeowner who prepays a mortgage loan could not be charged a penalty by the originator of the loan, but could be charged such a penalty by an assignee of the loan.[33] In this case, if Ms. Kemp prepaid the mortgage after its assignment, Nationstar would not only owe no refund or credit, but also could charge her a penalty for prepaying the loan while Countrywide could not have done so.

● *Refunds of excess escrow balance.* The statutory procedures for obtaining a refund of an excess balance that a borrower has paid into an escrow account that relates to a mortgage loan (for the payment of taxes, insurance and other expenses related to the loan) would apply only if the originator of the loan still holds the loan.[34] In this case, Ms. Kemp would have to look to long-gone Countrywide, not Nationstar, for such a refund.

● *Loan statements.* The originator of a mortgage loan, but not the assignee, would be required to provide a statement to the borrower, at least annually, concerning how the

---

[32] *See* CL §12-126(c) ("In the event of prepayment of the entire loan, the *lender* shall refund or credit to the borrower the unearned portion of the precomputed interest charge.") (emphasis added).

[33] *See* CL §12-105(d) ("In connection with a mortgage loan, a *lender* may not require or authorize the imposition of a penalty, fee, premium, or other charge in the event the mortgage is prepaid in whole or in part.") (emphasis added).

[34] See CL §12-109.1(d) ("A refund of any excess amount shall be made … [w]ithin 60 days after receipt by the *lender* of the borrower's request for a refund …") (emphasis added).

31

borrower's payments were credited and the remaining unpaid principal balance.[35]  In this case, Countrywide, but not Nationstar, would be required to provide such statements on the use of payments and the status of the loan balance to Ms. Kemp.

- *Exemptions from escrow account requirements*.  Some provisions of the Usury Law would be nonsensical if an "assignee" of a loan was necessarily distinct from a "lender," as they refer to a "lender" who purchases (*i.e.*, takes assignment of) a loan.[36]

There would also be consequences for other types of loans.  For example:

- *Repossession procedures*.  The Usury Law's provisions concerning repossession of goods securing a loan would apply to the originator of that loan, but not to an assignee of the loan.[37]

- *Interest rates*.  An interpretation of the term "lender" that excludes an assignee could limit the permissible interest rate that a lender could set.[38]

---

[35] *See* CL §12-106(c) ("At least annually …, a *lender* who receives scheduled monthly periodic payments on … loans secured by an interest in real property shall furnish to the borrower a written statement …") (emphasis added).

[36] *See, e.g.*, CL §12-109(d) (exemption from certain escrow account requirements applicable to "out-of-state lender" that purchases a loan, but exemption does not apply to "Maryland lender" that later purchases the same loan).

[37] *See, e.g.*, CL §12-115(a)(1) ("A *lender* may repossess goods securing a loan …") (emphasis added).

[38] *See* CL §12-103(a)(3)(iii) (making certain higher permissible interest rates contingent on the "*lender's*" compliance with repossession provisions of CL §12-115) (emphasis added); CL §12-103(b)(1)(iii) (making certain higher interest rates for mortgage loans contingent on the absence of a prepayment penalty).

● *"Usury" and assignees.* Under Nationstar's reading of the definition of "lender," an assignee would arguably be exempt from regulation under the Usury Law because the definition of "usury" in that law uses the term "lender."[39]

It would be anomalous to conclude that the General Assembly made such major substantive changes in the Usury Law by means of a code revision bill that expressly was intended *not* to change the law – changes apparently undetected for the next 40-plus years. As recounted earlier,[40] this Court in applying the Usury Law to mortgage loans in *B. F. Saul* warned against an interpretation of the statute that would lead to "absurd … consequences." 250 Md. at 722. In this case, such consequences would ensue if the Court were to construe the 1975 code revision to have both abrogated the common law rule that an assignee succeeds to the same rights and obligations as its assignor and substantially narrowed the scope of the Usury Law. None of these anomalous and illogical results pertains if the references to a "lender" are construed consistently with the common law relating to assignment of loans.[41]

---

[39] *See* CL §12-101(m) (defining "usury" as "the charging of interest by a *lender* in an amount which is greater than that allowed by [the Usury Law]") (emphasis added).

[40] *See* Part I.A.3 of this opinion.

[41] As noted in footnote 26 above, Nationstar has argued, on the one hand, that *all* assignees are exempt from CL §12-121 and, on the other, that some are exempt and some are not. The first results in the absurd consequences outlined in the text above; the second does not always square with the "plain language meaning" that Nationstar would ascribe to the statute. Moreover, the two arguments are inconsistent with one another. The Dissenting Opinion, which largely adopts Nationstar's arguments, does not resolve the inconsistency.

4.       Use of the Word "Assignee" in CL §12-109.2(a)(3)

In support of its interpretation of the term of "lender" in CL §12-101(f), Nationstar also relies on a definition of "lender" that appears in CL §12-109.2(a)(3) and that applies only to that section.[42]  Noting that the text of CL §12-109.2(a)(3) includes a reference to an "assignee of a lender," Nationstar draws a negative inference that the definition of "lender" generally applicable in the Usury Law in CL §12-101(f) must not encompass an assignee of a loan originator.

The language of CL §12-109.2(a)(3) must be considered in the context in which it appears.  It appears in, and applies to, one of the three sections in the Usury Law that concern escrow accounts – accounts in which funds for the payment of taxes, insurance premiums, and other expenses associated with real property are accumulated to pay those bills when they come due.  *See* CL §12-109(a)(2); 12-109.2(a)(2).

---

[42] CL §12-109.2 provides:

> (a)(1) In this section the following terms have the meanings indicated.
> (2) "Escrow account" has the meaning stated in § 12-109 of this subtitle.
> **(3) "Lender" includes a lender and assignee of a lender.**
> (4) "Mortgage" includes a mortgage and a deed of trust.
> (b)(1) Funds in any escrow account shall be kept separate from and may not be commingled with the funds of the lender.
> (2) A lender may place escrow funds received in connection with more than one mortgage into a single escrow account.
> (3) In the event of the bankruptcy of the lender, any escrow funds placed in any escrow account under this section may not be considered to be part of the bankrupt estate of the lender.

(emphasis added).

In 1974, the Legislature enacted the first of the escrow account sections, the predecessor of CL §12-109, which requires a "lending institution" that makes a mortgage to pay interest on the escrow account. Chapter 420, Laws of Maryland 1974. As is evident, this transaction is the opposite of most transactions covered by the Usury Law. With regard to an escrow account, the consumer is, in a certain sense, lending money to the financial institution for the period before the bill is due, and the financial institution pays interest to the consumer. The statute imposed the obligation to pay interest on an escrow account on the financial institution that lent money secured by the mortgage or an "assignee of an expense or escrow account." The evident purpose was to impose the obligation of paying interest on the entity that had the benefit of the funds held in escrow, whether or not that entity was the originator of the mortgage loan or an assignee of the escrow account.

In 1978, the General Assembly enacted a second section related to escrow accounts, codified at CL §12-109.1, which afforded the borrower more control over the use of excess funds accumulated in an escrow account, including the option to receive a refund of those funds. CL §12-109.1(b)-(c). The prohibitions in that section related to "any escrow account" and the statute imposed certain obligations as to escrow accounts on the "lender or servicer" of a loan. CL §12-109.1(b), (e). No reference was made in that statute to an assignee of a loan.

It is evident from a series of contemporaneous Attorney General opinions that these provisions concerning escrow accounts had raised a number of questions as to the extent to which these statutory obligations followed either the escrow account or the mortgage when an assignment was made, as an escrow account is not necessarily assigned with the

35

mortgage.  *See, e.g.*, 60 *Opinions of the Attorney General* 403 (1975) (discussing, among other things, an example in which a mortgage was assigned to a bank, but the assignor retained servicing and control of the escrow account); 63 *Opinions of the Attorney General* 438 (1978) (discussing whether an out-of-state assignee of a mortgage loan was subject to the requirement to pay interest on an escrow account and whether the borrower could look instead to the original in-state lender/assignor); 67 *Opinions of the Attorney General* 104 (1982) (discussing whether a lender's exemption from the obligation to pay interest on an escrow account also applied to the assignee of the escrow account).

Although the Attorney General's answers to these questions are beside the point here, the fact that the questions were asked demonstrates that the mortgage industry and State regulators were seeking guidance on how the escrow account provisions in the Usury Law applied when there was an assignment of a mortgage, particularly when an escrow account did not accompany that assignment or was later assigned separately.

When the General Assembly later added a third section concerning escrow accounts – CL §12-109.2 – to the Usury Law in 1986 to ban service charges,[43] it made clear in the substantive terms of that provision that the limitations imposed with respect to escrow accounts also applied to "a lender, or the assignee of the lender."  CL §12-109.2(b) (1986).  When that law was amended a few years later in 1989 to add additional restrictions barring

---

[43] This provision prohibited a lender from imposing collection fees or service charges in connection with an escrow account and was part of the same bill designed to lower closing costs in Maryland that enacted CL §12-121.  Chapter 628, Laws of Maryland 1986.

commingling of escrow accounts, the reference to "a lender, or the assignee of the lender" was converted to a definition, presumably to avoid having to repeat the phrase repeatedly in the section.

There was no indication in the 1986 or 1989 amendments that the General Assembly intended to repeal the common law rule that the assignee of a loan steps into the shoes of the assignor. If the General Assembly had intended in 1986 to broadly strip borrowers whose loans were assigned of the protection of the Usury Law when it added the definition in CL §12-109.2(a)(3) – a section that regulates only escrow accounts – it did not so state in the purpose paragraph of the title of either the 1986 or the 1989 bills – or anywhere else in the legislative history of CL §12-109.2.

5.    Case Law Concerning CL §12-121

This Court had occasion to construe CL §12-121 as applied to the assignee of a mortgage in *Taylor v. Friedman,* 344 Md. 572 (1997). That case concerned whether the prohibition in CL §12-121 applied to post-default inspection fees in connection with a mortgage loan that had been assigned. The collection fees had been assessed seven years after the closing on the loan. Although the status of the respondent bank as an assignee of the mortgage loan was obvious from the facts recited in the Court's opinion, no one apparently thought that made a difference. The bank did not claim that the 1975 code revision had exempted it and other assignees of loans from the Usury Law, and *a fortiori* from the prohibition in CL §12-121. Rather, the bank in that case focused on the more salient argument that legislation proposed by a task force to deal with high closing costs should not be construed to apply after the closing. 344 Md. at 581-82. After reviewing the

legislative history of the 1986 bill that added CL §12-121 to the Usury Law and noting that its provisions regulated more than the closing of a loan, the Court held that the prohibition in CL §12-121 was not confined to the origination of the loan. *Id*. at 584.[44] That holding applied to the assignee of the mortgage in *Taylor* and, given the frequency with which mortgages were assigned by the time of that decision in 1997, would obviously apply to many assignees.[45]

This Court also addressed assignments under the Usury Law in *Thompkins v. Mountaineer Investments, LLC*, 439 Md. 118 (2014), although that decision primarily related to liability under a different statute – the Secondary Mortgage Loan Law ("SMLL").[46] In *Thompkins*, this Court held that an assignee was not liable for a violation of the SMLL committed by the original lender when the loan was originated, but that the assignee was subject to the requirements of the SMLL and would be liable for its own violations of the statute. 439 Md. at 141.

While the *Thompkins* case concerned application of the SMLL, the Court's analysis drew on provisions of the Usury Law and the common law of assignment. In the course

---

[44] The Court also noted that the General Assembly had deleted the phrase "as a condition to granting the loan" from the proposed version of CL §12-121(c)(2), which suggested that it intended for the restriction to extend beyond the origination of the loan. 344 Md. at 583-84.

[45] A newspaper article from early 1984 cited in Nationstar's reply brief reported that at least 43% of new mortgage loans had been assigned. Petitioners/Cross-Respondents Reply Brief at 16-17 n.7.

[46] *See* footnote 4 above.

of its opinion, the Court noted that it was unlikely that the General Assembly intended that the protections of the SMLL or the Usury Law could be circumvented simply by assigning a loan. 439 Md. at 132-33. The Court also observed that the Usury Law in particular contemplated that an assignee could be liable for violations of that law. *Id.* at 132 n.12 ("While one section of the statute states that it does not provide a remedy against an assignee of a usurious loan who took the assignment for a 'bona fide and legal consideration without notice of any usury in its creation' (CL §12-112), it implicitly allows a usury action to be brought against an assignee that cannot satisfy that condition.").[47] Finally, the Court alluded to the common law principle that an assignee steps into the "shoes" of its assignor, but distinguished the situation in the case before it, which concerned liability for prior violations of the SMLL by the originator of the loan, not the ongoing application of the statute to the assignee. *Id.* at 139-40.

No Maryland appellate decision supports Nationstar's construction of the purview of CL §12-121. Instead, Nationstar relies on unpublished trial court decisions of the federal district court, none of which considered the legislative history of the statute.[48] The only

---

[47] *See also* Part III.B.2 of this opinion.

[48] In *Suazo v. U.S. Bank Trust, NA*, 2019 WL 4673450 (D. Md. Sept. 25, 2019), the court held that a count of the complaint in that case alleging a violation of CL §12-121 failed to state a claim because an inspection fee could be lawful if it fell within an exception to the statute and the complaint failed to allege that the inspection fees in question fell outside those exceptions. 2020 WL 4673450 at *9-10. The particular mortgage loans involved in the case had been assigned to a special purpose acquisition entity. In the course of its opinion in the case, the court also opined that the entity, as an assignee of the mortgage loans, was not a "lender" under the CL §12-101(f) and therefore not subject to the restrictions on inspection fees, reasoning that "one does not become a 'mortgage lender' merely by obtaining title to a mortgage loan." *Id*. at *8-10.

39

one of those decisions that considered the consequences of that interpretation of CL §12-101(f) acknowledged that it would render the Maryland Usury Law "functionally toothless."[49]  As indicated above, however, the most pertinent Maryland appellate cases indicate that the Usury Law is alive and well.

6.      Summary

CL §12-121 limits the authority of a person who makes a mortgage loan to charge property inspection fees in connection with that loan.  The common law rule, long applied to assigned mortgages in Maryland, provides that, if the originator of a mortgage loan assigns the loan, the assignee succeeds to the same rights and obligations under the loan agreement as its assignor.  When the General Assembly added a definition of "lender" to the Maryland Usury Law as part of a 1975 code revision that made the Usury Law part of

_____

That court repeated the same analysis, essentially verbatim, in two other unpublished decisions that the same judge issued simultaneously with *Suazo*. *See Robinson v. Fay Servicing, LLC*, 2019 WL 4735431 (D. Md. Sept. 27, 2019) at *7-9; *Roos v. Seterus, Inc.*, 2019 WL 4750418 (D. Md. Sept. 30, 2019) at *4-6.  A few months later, another unpublished decision of the federal district court cited *Suazo* and the related cases to reach the same conclusion.  *Flournoy v. Rushmore Loan Management Services, LLC*, 2020 WL 1285504 (D. Md. March 17, 2020) at *5-6.

The court in *Suazo* and the related cases did not consider the Maryland common law concerning assignment of mortgages, the structure of the Maryland Usury Law, the fact that the addition of CL §12-101(f) was part of a non-substantive code revision of that law, or the consequence that its interpretation would exempt an assignee of a loan from most of the Usury Law.  Indeed, those decisions relied in part on *the Circuit Court decision on appeal in this case* for their interpretation of the statute.  *See Roos*, 2019 WL 4750418 at *5; *Flournoy*, 2020 WL 1285504 at *5.  Accordingly, we do not find *Suazo* or the cases that repeated its analysis to be persuasive.

[49] *Flournoy*, 2020 WL 1285504 at *7.

40

the Commercial Law Article, it did not change that rule. In keeping with the principle that the Court is to harmonize statutory provisions when possible and to presume that the Legislature does not abrogate the common law without making that intention clear, we interpret the term "lender" in CL §12-121 to include an assignee who holds an outstanding loan.[50]

The argument advanced by Nationstar in this case – that the assignee (Fannie Mae) succeeded to the right of its assignor (Countrywide) to charge fees authorized by paragraph 14 of the deed of trust, but did not succeed to the limitations incorporated in that authorization – would give the assignee greater rights as "lender" under the deed of trust than its assignor, the entity actually defined as "lender" in that instrument. Nationstar finds authorization for the fees in paragraph 14 of the deed of trust, while jettisoning the statutory limitations such as CL §12-121 explicitly incorporated in that authorization.[51] The

---

[50] Noting that CL §12-122 provides that a "knowing and willful" violation of CL §12-121 is a misdemeanor, Nationstar argues that CL §12-121 should be construed narrowly not to apply to an assignee of a loan under the "rule of lenity." The "rule of lenity" is "not a rule in the usual sense, but an aid for dealing with ambiguity in a criminal statute." *Oglesby v. State*, 441 Md. 673, 681 (2015). However, it is not so much a canon of statutory construction as a "tool of last resort" when a court despairs of resolving an ambiguity in a statute with the usual tools of statutory construction. *Id*. That is not the case here. As the analysis in the text demonstrates, the normal tools of statutory construction are adequate to the task at hand.

[51] The only authority cited by Nationstar for this proposition is an unpublished federal district court opinion that stated that an assignee does not "inherit the *statutory* obligations of the original lender, when such laws regulate the initial maker of the loan regardless of any contractual terms to the contrary." *Flournoy v. Rushmore Loan Management Services, LLC*, 2020 WL 1285504 (D. Md. March 17, 2020) at *6 (emphasis in original). That opinion did not cite any authority for this proposition, which would appear to open up the possibility that a lender could launder a loan agreement of unwanted statutory provisions incorporated in the agreement (*i.e.*, restrictions imposed by the Usury

common law concerning assignment of mortgages does not support such a result. And, the addition of a definition of "lender" as part of code revision did not change that law.

Accordingly, we hold that Fannie Mae (and its agent Nationstar), as assignee of Countrywide, did not acquire any greater right to assess property inspection fees against a borrower like Ms. Kemp than Countrywide itself had under the deed of trust, which limited the authorization to charge fees prohibited by State law.[52] Ms. Kemp has adequately pled causes of action based on a violation of CL §12-121.

## C. *Whether the Complaint States a Claim under the MCDCA*

As outlined above, the complaint in this case includes a count that alleges a violation of CL §14-202(8) of the MCDCA, which would also constitute a violation of the Maryland

---

Law) simply by assigning the loan. That is not Maryland law. *See Post v. Bregman*, 349 Md. 142, 156 (1998) ("parties to a contract are deemed to have contracted with knowledge of existing law and … the laws which subsist at the time and place of the making of a contract … enter into and form part of it …") (internal quotation marks omitted). Moreover, the *Flournoy* court did not take into consideration the context and history of the Maryland Usury Law or of Maryland common law concerning assignments of mortgage loans. We do not adopt its rationale.

[52] In a similar vein, the loan modification instrument that Nationstar drafted and entered into with Ms. Kemp on behalf of Fannie Mae identifies Fannie Mae as the "lender" and uses that term throughout the document to refer to Fannie Mae's rights and obligations under that agreement. Whether this document is construed to mean that Fannie Mae has made a new loan as part of the loan modification or is the assignee of the originator of the original loan, it would appear to indicate that Fannie Mae (and its agent Nationstar) is subject to the restrictions on inspection fees either in its own right or as the assignee of Countrywide. If there were any ambiguity in how the provisions in the deed of trust or the loan modification agreement should be construed, under ordinary contract principles, they would be construed against the drafters – in this case, Fannie Mae and Nationstar. *Impac Mortgage Holdings, Inc. v. Timm,* 474 Md. 495, 508-10 (2021), 2021 WL 2965006 (July 15, 2021) at *6.

42

Consumer Protection Act. In its opinion, the Court of Special Appeals noted that some of its past opinions had held that claims under the MCDCA are limited to those concerning "methods" of debt collection, as opposed to the "validity" of the debt being collected. The Court of Special Appeals held that the Circuit Court properly dismissed Ms. Kemp's claim under the MCDCA because, in the view of the intermediate appellate court, that claim was addressed to the "validity" of the underlying debt (*i.e.*, the property inspection fees), rather than the "method" by which Nationstar was attempting to collect that debt. 248 Md. App. at 35-38.[53]

On appeal, Ms. Kemp contends that the MCDCA is not limited to "methods" of debt collection. Nationstar takes the contrary position and further argues that, even if subsection (8) applies to its effort to collect the property inspection fees, Ms. Kemp failed to meet "her burden of alleging and proving that [Nationstar] had 'knowledge' that the right it threatened to enforce 'did not exist.'"[54]

---

[53] We agree with the Court of Special Appeals that the Circuit Court's conclusion that letters sent by Nationstar to Ms. Kemp did not constitute an attempt to collect a debt was dubious at best. 248 Md. App. at 33-35. Nationstar has not pressed that argument before us.

[54] We note parenthetically that, at this stage of the case – appellate review of the grant of a motion to dismiss – a plaintiff bears no burden of "proving" a claim. Rather, the complaint must allege facts that, if true, *could prove* the claim. *See* Part III.A.1 of this opinion above.

1.      Whether the MCDCA is Limited to "Methods" of Debt Collection

The MCDCA prohibits a debt collector from engaging in certain conduct when "collecting or attempting to collect an alleged debt." The particular provision at issue before us is CL §14-202(8). That subsection reads as follows:

> In collecting or attempting to collect an alleged debt a collector may not: …
> *          *          *          *          *
> (8) Claim, attempt, or threaten to enforce a right with knowledge that the right does not exist;…

In an opinion issued today, we have recounted in some depth the origin and development of the "methods" versus "validity" distinction that appears in some prior cases, and particularly as it relates to an alleged violation of CL §14-202(8). *Chavis v. Blibaum & Associates, P.A.*, 476 Md. 534, 555-61 (2021), op. at 18-24. In that opinion, we conclude that "the remedial nature of the MCDCA requires that we interpret § 14-202(8) broadly to reach any claim, attempt, or threat to enforce a right that a debt collector knows does not exist." *Id.* at 560, op. at 23 (citations omitted). In particular, a plaintiff may invoke subsection (8) "when the amount claimed by the debt collector includes sums that the debt collector, to its knowledge, did not have the right to collect." *Id.* at 560, op. at 23-24.

In this case, Ms. Kemp's complaint alleged that Nationstar assessed property inspection fees against her and capitalized those fees into the mortgage debt that it is collecting from her under the loan modification agreement. The complaint alleged, and we have held, that the assessment of such fees by the assignee of a mortgage loan (or a servicer on the assignee's behalf) violates CL §12-121. Thus, the complaint adequately alleges that Nationstar, as part of its debt collection efforts, is asserting that it has a right "that does not

44

exist." The remaining question is whether the complaint adequately alleges that Nationstar did so "with knowledge that the right does not exist."

2. The Knowledge Element of a Violation of the MCDCA

The Circuit Court did not allude to the knowledge element of subsection (8) in justifying its dismissal of the MCDCA claim. Nor did the Court of Special Appeals discuss the knowledge element of subsection (8) in its opinion explaining why it affirmed the dismissal of the MCDCA count on a different ground than the Circuit Court. Perhaps for that reason, Ms. Kemp did not directly address the knowledge element in her cross-petition and briefs seeking reversal of the decision of the Court of Special Appeals on that count.[55]

Nationstar did include a brief discussion of the knowledge element in its reply brief, although it urges us not to reach the issue in this case.[56] Nationstar argues that, to succeed on a claim under subsection (8), a plaintiff must prove that the defendant acted "with knowledge of, or in 'reckless disregard' to, the existence of the 'right.'" Then, elaborating on that standard, Nationstar asserts that, while a debt collector could not negate the

---

[55] In her cross-petition and her briefs filed in this Court, Ms. Kemp argues that the Court of Special Appeals, in citing its prior decision in *Chavis v. Blibaum Associates, P.A.*, 246 Md. App. 517 (2020), erroneously introduced what she labels a "novel legal error defense" into the analysis under CL §14-202(8). Her argument is difficult to follow; the portion of the *Chavis* opinion she cites for this proposition was not cited by the intermediate appellate court in this case and, in any event, does not relate directly to the MCDCA. Possibly, her argument relates to whether a mistake of law may negate a finding that a defendant had the "knowledge" required for a violation of subsection (8). But neither the Circuit Court's grant of the motion to dismiss the MCDCA claim nor the affirmance of that dismissal by the Court of Special Appeals relies on such a ground.

[56] This was one of Nationstar's alternative arguments in response to Ms. Kemp's argument, which is described in the previous footnote.

knowledge element simply by not becoming aware of "an obvious provision of law," the collector could negate that element if the law is "unclear" and there is a "potentially …meritorious" argument in the collector's favor. As explained today in *Chavis*, we agree that the knowledge element is met when the law is settled, because the debt collector's recklessness in failing to discover that law is the equivalent of knowledge. *Id*. at 566-67, op. at 30-31. However, we do not agree that the existence of a "potentially meritorious" argument as to the existence of the right necessarily negates knowledge. As also explained in *Chavis*, the question whether a debt collector acted recklessly is a question of fact, to be determined in light of the particular circumstances. *Id.* at 567, 569, op. at 31, 33.

In short, to adequately allege the requisite knowledge for purposes of subsection (8), a plaintiff must allege that the defendant either actually knew that it did not possess a right it claimed as part of its debt collection efforts, or recklessly disregarded the falsity of that claim. Here, the complaint alleged that the deed of trust did not authorize the imposition of such a fee because it incorporated "Applicable Law," including CL §12-121, which prohibits such an inspection fee. The complaint also described, and attached as an exhibit, the 2014 advisory notice of the Maryland Commissioner of Financial Regulation to mortgage servicers like Nationstar. That advisory notice, which did not distinguish mortgages that a servicer handled on behalf of a loan originator from those handled on behalf of an assignee (likely the vast majority of the mortgages handled by servicers as of 2014), informed servicers that it was illegal to charge mortgage borrowers for property inspection fees. Further, the advisory notice provided the example of a case involving a

46

mortgage serviced on behalf of an assignee.[57] The complaint thus alleges that Nationstar had knowledge that it did not have the right to impose such a fee.[58]

3.    Summary

The MCDCA applies to debt collectors who collect or attempt to collect a debt arising from a consumer transaction – that is, a transaction for "personal, family, or household purposes." CL §14-201(b)-(c). There appears to be no dispute that Ms. Kemp's mortgage loan is a consumer transaction within the purview of the statute.

CL §14-202(8) prohibits the claim or attempt to enforce a "right" with knowledge that the alleged right does not exist. We conclude that Ms. Kemp's complaint alleged the elements of a claim under CL §14-202(8): It alleged Nationstar's claim of a right to assess a property inspection fee, the illegality of the fee that Nationstar claimed, and Nationstar's knowledge that the right did not exist. We therefore hold that Ms. Kemp adequately pled the elements of a cause of action under CL §14-202(8).

## IV

### Conclusion

For the reasons set forth above, we hold:

---

[57] *Taylor v. Friedman*, 344 Md. 572 (1997), which is also described in Part III.B.5 of this opinion.

[58] In asserting that the MCDCA count was properly dismissed at the pleading stage of this case, the Dissenting Opinion relies on the methods/validity distinction that this Court has rejected in *Chavis* and, with respect to the knowledge element of subsection (8), does not address the allegations in the complaint relevant to that element.

47

(1) The prohibition on charging inspection fees in CL §12-121 applies to an assignee of a mortgage loan, such as Fannie Mae, and a servicer, such as Nationstar.

(2) The Second Amended Complaint adequately alleged that Nationstar attempted to collect the property inspection fees by asserting that it had a right to assess those fees against Ms. Kemp, with knowledge that such a right did not exist, in violation of CL §14-202(8).

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. COSTS TO BE PAID BY PETITIONERS/CROSS-RESPONDENTS.**

Circuit Court for Montgomery County
Case No. 441428V
Argument: March 5, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 43

September Term, 2020

_____

NATIONSTAR MORTGAGE LLC D/B/A/ MR.
COOPER, ET AL.

v.

DONNA KEMP
_____

Barbera, C.J.,
McDonald,
Watts,
Hotten,
Getty,
Booth,
Biran,

JJ.
_____

Dissenting Opinion by Getty, J.
_____

Filed: August 27, 2021

Respectfully, I dissent. While the Majority delineates a clear and concise path for applying the Maryland usury statutes to the facts of this case, I believe that they are following the wrong path in interpreting the relevant statutes here. The Majority grounds its interpretation of the usury statutes in the "longstanding common law rule that an assignee of a loan succeeds to the same rights and limitations as its assignor[.]" Maj. Op. at 29. However, the General Assembly, in enacting Md. Code (1975, 2013 Repl. Vol.), Com. Law ("CL") § 12-101(f) and Md. Code (1975, 2013 Repl. Vol.), Com. Law ("CL") § 12-121 did not abrogate the common law and we need not look to the common law rules of assignment to determine whether the General Assembly's plainly stated language incorporates assignees of a mortgage lender. Nationstar Mortgage LLC ("Nationstar") and the Federal National Mortgage Association ("Fannie Mae"),[1] as assignees of the mortgage originator, Countrywide, received the exact same rights under the deed of trust in this case, *i.e.* the rights permitted by applicable law as set forth by the plain language of the relevant statutory provisions.

Given that assignees of a "lender" are omitted from the definition of the word "lender" in CL § 12-101(f) and from the language concerning the prohibition on inspection fees in CL § 12-121, I would rely on the unambiguous plain language and the clearly stated intent of the General Assembly in defining a "lender" at the time the consumer protection statutes were enacted. Accordingly, I would hold that the Circuit Court for Montgomery County did not err in granting Nationstar's and Fannie Mae's motion to dismiss.

---

[1] We sometimes refer to Nationstar and Fannie Mae collectively as "the Petitioners."

In affirming the Court of Special Appeals below, the Majority determined that the word "lender" in CL § 12-121 includes actors within the secondary mortgage market that do not make loans (the "inspection fee issue"). However, the word "lender," as it was defined in CL § 12-101(f)[2] during the circuit court's proceedings, included only "a person who makes a loan" and was enacted before the proliferation of the secondary mortgage industry.[3] Just as the Court of Special Appeals did, the Majority looks past the unambiguous plain language of the usury statutes and the history of the secondary mortgage market in determining that, even though Nationstar and Fannie Mae do not make loans, they are subject to the prohibition on inspection fees in CL § 12-121. *Kemp v. Nationstar Mortg. Ass'n*, 248 Md. App. 1, 8 (2020) (holding that the circuit court's interpretation of the usury statutes "would defeat the broader statutory purpose and lead to absurd results[.]"); Maj. Op. at 33 ("[T]his Court . . . warned against an interpretation of the statute that would lead to absurd . . . consequences. [S]uch consequences would ensue if the Court were to construe the 1975 code revision to have both abrogated the common law rule that an assignee succeeds to the same rights and obligations as its assignor and substantially narrowed the scope of the Usury Law." (internal quotation marks omitted)).

---

[2] We sometimes refer to CL § 12-101(f) and CL § 12-121 collectively as the "usury statutes."

[3] CL § 12-101(f) was amended in 2018 to read: "'Lender' means a licensee or a person who makes a loan subject to this subtitle." For the purposes of this opinion, unless stated, any citation to the definition of "lender" in CL § 12-101(f) refers to the pre-2018 definition.

I also dissent from the Majority's decision to reverse the Court of Special Appeals' holding regarding Donna Kemp's Maryland Consumer Debt Collection Act ("MCDCA") claim (the "MCDCA issue"). The Court of Special Appeals correctly affirmed the circuit court's judgment dismissing Ms. Kemp's claim under the MCDCA because Md. Code (1975, 2013 Repl. Vol.), Com. Law ("CL") § 14-202 provides a cause of action for a plaintiff to recover for improper *methods* of debt collection—not an avenue to challenge the validity of an underlying debt. Moreover, even if CL § 14-202 provides a cause of action to challenge the validity of an underlying debt, the Petitioners did not have the "knowledge" required to be held liable under the statute. For the reasons below, I would reverse the judgment of the Court of Special Appeals on the inspection fee issue and affirm that court's judgment upholding the dismissal of Ms. Kemp's MCDCA claim.

The circuit court applied a common-sense plain language interpretation of the relevant statutes in this case and determined that "[t]he problem with the plaintiff's theory of the case . . . is that the facts alleged, even if true, do not fit the applicable statute under which [Ms. Kemp] has sued." *Kemp v. Seterus, Inc.*, No. 441428-V, at 9 (Montgomery Cty. Cir. Ct. Oct. 22, 2018) (memorandum and order granting Defendants' motion to dismiss). In dismissing Ms. Kemp's inspection fee claim, the circuit court's plain language interpretation of the usury statutes comports with the General Assembly's clearly stated intent, and the circuit court adopted an interpretation articulated by numerous federal courts and supported by the relevant legislative history.

3

The plain language of CL § 12-101(f) and CL § 12-121[4] is unambiguous, therefore our analysis begins with the text of the statutes. We then look to the history of the usury statutes, which supports the circuit court's statutory interpretation in two ways. First, the history of the secondary mortgage industry confirms that the General Assembly did not intend for the definition of "lender" to include mortgage assignees that do not make loans when it enacted the definitions for the interest and usury subtitle in 1975. Second, in looking to *Taylor* and *Thompkins*, the Court of Special Appeals incorrectly ignored the legislative history of CL § 12-121. We lastly turn to Ms. Kemp's MCDCA claim which, like her inspection fee claim, was properly dismissed by the circuit court for failing to state a claim upon which relief could be granted.

**A.     Ms. Kemp's Inspection Fee Claim Was Properly Dismissed by the Circuit Court.**

       *1.     The Majority Improperly Overlooks the Unambiguous Plain Language of the Usury Statutes.*

The Majority improperly overlooks the plain language of the usury statutes in determining that the term "lender" in CL § 12-121, as it is defined in § 12-101(f), includes secondary mortgage purchasers like Fannie Mae and mortgage servicers like Nationstar. The Majority's interpretation of the usury statutes, like that of the Court of Special Appeals, conflicts with the clear intent of the General Assembly in enacting CL §§ 12-101(f) and 12-121. Contrary to the Majority's reasoning, I believe that the General Assembly plainly

---

[4] For ease of reading and clarity, I refer to the sections and subsections of the bills and statutes involved directly as such—*i.e.* "§ 12-101(f)"—instead of providing the full citation of CL § 12-101(f).

4

indicated in the text of §§ 12-101(f) and 12-121 that actors within the secondary mortgage market who do not make loans are not "lenders" under Subtitle 1 of Title 12.

This Court's rules of statutory interpretation are well defined. We begin—and often end—with the plain language of the statute, of which "ordinary, popular understanding of the English language dictates" our interpretation. *Johnson v. State*, 467 Md. 362, 372 (2020) (quoting *Blackstone v. Sharma*, 461 Md. 87, 113 (2018)). In deferring "to the policy decisions enacted into law by the General Assembly[,]" we read the "statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Town of Forest Heights v. Md.-Nat'l Cap. Park & Plan. Comm'n*, 463 Md. 469, 478 (2019) (quoting *Brown v. State*, 454 Md. 546, 550–51 (2017)). "If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written." *Fangman v. Genuine Title, LLC*, 447 Md. 681, 691 (2016) (quoting *Montgomery Cty. v. Phillips*, 445 Md. 55, 62 (2015)).

The definitional section for the interest and usury subtitle of Title 12, Subtitle 1, was enacted during the recodification of the Commercial Law Article in 1975 and provides definitions for the actors that are referenced throughout the subtitle (*i.e.*, "borrower," "lender," and "person"):

> (a) In this subtitle the following words have the meanings indicated.
> (b) "Borrower" means a person who borrows money under this subtitle.
> * * *
> (f) "Lender" **means a person who makes a loan** under this subtitle.
> (g) "Person" includes an individual, corporation, business trust, statutory trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal or commercial entity.

5

CL § 12-101(a), (b), (f), (g) (emphasis added).  This section was updated in 2018 to include

definitions for "licensee" and "loan," while adding licensees to the definition of "lender."[5]

*See* 2018 Md. Laws, ch. 732.

The inspection fee statute at issue here, § 12-121, was enacted in 1986 in response

to the Report of the Task Force on Real Property Closing Costs that was created by

Governor Harry R. Hughes.  *See Taylor v. Friedman*, 344 Md. 572, 579 (1997).  Section

12-121 was enacted for the purpose of "prohibiting imposition of a lender's inspection fee

under certain circumstances" and reads:

> (a) In this section, the term "lender's inspection fee" means a fee **imposed by a lender** to pay for a visual inspection of real property.
> (b) Except as provided in subsection (c) of this section, a lender may not impose a lender's inspection fee in connection with a loan secured by residential real property.
> (c) A lender's inspection fee may be charged if the inspection is needed to ascertain completion of:

---

[5] The new language in § 12-101 included:

> (g) "Licensee" means a person that is required to be licensed to make loans subject to this subtitle, regardless of whether the person is actually licensed.
> (h)(1) "Loan" means a loan or an advance of money or credit subject to this subtitle, regardless of whether the loan or advance of money or credit is or purports to be made under this subtitle.
> (h)(2) "Loan" does not include:
> > (i) A loan or advance of money or credit subject to Subtitle 3 of this title, unless made under § 12-101.1 of this subtitle;
> > (ii) A plan or loan for which a written election is made under Subtitle 3, Subtitle 4, Subtitle 9, or Subtitle 10 of this title; or
> > (iii) An installment sale agreement as defined in § 12-601 of this title.

CL § 12-101(g), (h).  As described in footnote 3, *supra*, "licensee" was added to the definition of "lender" in 2018 to read: "'Lender' means a *licensee or a* person who makes a loan *subject to* this subtitle."  CL § 12-101(f) (emphasis denoting additions to the definition).

6

> (1) Construction of a new home; or
> (2) Repairs, alterations, or other work required by the lender.
> (d) This section does not apply to an appraisal of the value of real property
> by a lender or to fees imposed in connection with an appraisal.

CL § 12-121; *see* 1986 Md. Laws, ch. 628 (emphasis added).

In looking to the plain language of § 12-121, the circuit court recognized that Ms. Kemp's amended complaint "[did] not allege that either [Nationstar] or Fannie Mae made any of the loans in question[], or even make[] any loans in general, within the meaning of Section 12-101." *Kemp*, No. 441428-V, at 9 (Montgomery Cty. Cir. Ct. Oct. 22, 2018) (memorandum and order granting Defendants' motion to dismiss). The circuit court accurately concluded that "[j]ust as alchemy cannot transform lead into gold, Fannie Mae's purchase of [Ms.] Kemp's loan from Countrywide does not make Fannie Mae a lender under the statute." *Id.* Although the Court of Special Appeals disagreed with the circuit court's dismissal of Ms. Kemp's claim, it agreed with the circuit court's plain language interpretation of the usury statutes and, contrary to its holding, stated that "it appears that the legislative intent was to limit 'lenders' to those entities who originate loans." *Kemp*, 248 Md. App. at 21.

Here, the Majority ignores the unambiguous text of the usury statutes in surmising that, collectively, the provisions of the Usury Law "suggest that the term 'lender' includes not only an originator of a loan but also an assignee." Maj. Op. at 26. This broad proclamation is illogical given the General Assembly's differentiation between mortgage market actors in its enactments, and impermissibly renders references to "assignees" and "mortgage servicers" throughout the Usury Law surplusage. *Town of Forest Heights*, 463

7

Md. at 478 (quoting *Brown*, 454 Md. at 551) (Our statutory analysis "ensure[s] that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.").

After finding ambiguity where none exists, the Majority sees fit to extensively detail the legislative history of the usury statutes and paint the Petitioners' position as illogical. *See* Maj. Op. at 26–33. Although Maryland courts occasionally "see fit to examine extrinsic sources of legislative intent" to check their plain language understanding of a statute, the Majority uses the legislative history as a bridge to avoid the unambiguous plain language enacted by the General Assembly. *Phillips v. State*, 451 Md. 180, 197 (2017) (quoting *Douglas v. State*, 423 Md. 156, 178 (2011)). Like the Court of Special Appeals below, the Majority improperly cherry-picks parts of the relevant legislative history and relies heavily on the existence of sister provisions in the Usury Law to reach its interpretation. In situations such as this, where the General Assembly's intent is clear by its plain language, such an approach is antithetical to our fundamental rules of statutory interpretation. The contextual circumstances of a statute should not be used to contravene the General Assembly's plainly stated intent, nor should undue weight be put on the relevant legislative history to buttress an atextual interpretation of the usury statutes.

Indeed, every federal district court that has addressed the applicability of § 12-121 to assignees of a mortgage originator has recognized the unambiguous intent of the General Assembly based on the plain language of the statute. Most recently, in *Flournoy v. Rushmore Loan Management Services, LLC*, the United States District Court for the District of Maryland considered a number of claims alleging that Rushmore Loan

8

Management Services ("Rushmore") violated the MCDCA and the Maryland Consumer Protection Act ("MCPA") by illegally imposing inspection fees in violation of CL § 12-121. 2020 WL 1285504, at *3 (D. Md. Mar. 17, 2020). In considering the plaintiffs' claims, the court was required to determine whether Rushmore, among other defendants, was a "lender" under CL § 12-121 when it did not make loans, but rather purchased them on the secondary mortgage market. *Id.* at *5.

In looking to "fundamental principles of statutory construction," the court found that "[t]he plain language of the Usury Statute[] specifically, and unambiguously, announces that 'lender *means* a person who makes a loan under this subtitle.'" *Id.* (emphasis in original) (quoting CL § 12-101(f)). The court explained that

> [t]he meaning of "makes a loan" is clear: a person who "makes" a loan creates the loan itself. Viewing the complaint facts as true and most favorably to Plaintiffs, Defendants certainly *acquire* the loan once made, and thereafter *service*, and *maintain* the loan, but they do not play any role in *making* the loan.

*Id.* (emphasis in original).

The court characterized its interpretation of § 12-121 as "predictabl[e]" based on three previous federal district court decisions that all reached the same result. *Id.; see Roos v. Seterus, Inc.*, 2019 WL 4750418, at *4 (D. Md. Sept. 30, 2019) ("The plain language of the statute, which is clear and unambiguous, states that 'a **lender** may not impose a lender's inspection fee . . . .'" (emphasis in original)); *Robinson v. Fay Servicing, LLC*, 2019 WL 4735431, at *9 (D. Md. Sept. 27, 2019) ("A 'lender' under the statute is defined as 'a person who makes a loan under this subtitle.' The Amended Complaint does not allege that any of the [d]efendants make loans." (citation omitted)); *Suazo v. U.S. Bank Trust, NA*, 2019

9

WL 4673450, at \*10 (D. Md. Sept. 25, 2019) ("The inspection fee statute does not otherwise include assignees within its ambit."). The issue in this case is no different than those considered in the federal district court decisions cited above and should be resolved by looking to the unambiguous text of the statutory provisions.

Much like the plaintiffs in the cases discussed above, Ms. Kemp seeks to have this Court recognize a right of action against assignees of a mortgage originator when (1) the plainly stated intent of the General Assembly demonstrates that none exists; and (2) her amended complaint fails to allege that the Petitioners in this case make loans. In recognizing such a cause of action, this Court signals that it is willing to look past the unambiguous plain language of a statute even when, at best for Ms. Kemp's case, the legislative history is inconclusive as to whether the General Assembly considered assignees when it enacted § 12-101(f). *See Lockshin v. Semsker*, 412 Md. 257, 275 (2010) ("We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with 'forced or subtle interpretations' that limit or extend its application." (citation omitted)).

I disagree with the Majority's interpretation of §§ 12-101 and 12-121 and instead am in agreement with the various federal courts that have found that the text of the usury statutes unambiguously indicates the intent of the General Assembly that the word "lender" pertains only to one who makes loans. This Court's plain language analysis first requires us to determine what the General Assembly meant when it used the word "makes," *i.e.,* "a person who *makes* a loan," in § 12-101(f). Ms. Kemp seeks to have the Court define "makes"—in the context of mortgage loans—to include those who provide liquidity for

10

primary mortgage originators by purchasing loans on the secondary mortgage market.  But

such an expansive definition of the word "makes" is at odds with its ordinary meaning.

Merriam-Webster defines "make" as "to bring into being by forming, shaping, or altering

material."  *Make*, Merriam-Webster, https://www.merriam-webster.com/dictionary/make

[https://perma.cc/6U43-RJ83].   While we recognize that our statutory analysis is not

confined to "putting the [text] under [a] microscope . . . with a dictionary [in] hand," this

definition suggests that the General Assembly intended to include only those mortgage

originators that bring mortgage loans "into being" on the primary mortgage market.[6]  Maj.

Op. at 20.

Thus, it is difficult to reconcile the dictionary definition of "make" with Ms. Kemp's

preferred interpretation because Nationstar and Fannie Mae did not bring Ms. Kemp's loan

"into being."  Nationstar (as a successor to Seterus) only serviced Ms. Kemp's *existing*

loan. It did not originate her mortgage loan *or* purchase it on the secondary market.  Fannie

Mae, who only purchased Ms. Kemp's mortgage on the secondary market, is barred by

federal law from originating mortgage loans.  *See* 12 U.S.C. § 1719(a)(2) ("The corporation

shall not be permitted to use its lending authority . . . to originate mortgage loans.").  Hence,

the unambiguous plain language of the statute controls the outcome of this case.  Because

neither entity "makes" loans under § 12-101(f), the circuit court correctly interpreted the

---

[6] We understand that a strict, plain-language reading of § 12-101(f) as it was intended at the time that the statute was enacted in 1975 might run contrary to the modern policy aversion to inspection fees.  However, we explain more fully *infra* why this plain language understanding of the statute comports with the legislative history and why the Majority's interpretation of the language runs contrary to the legislature's understanding of the secondary mortgage market when § 12-101(f) was enacted in 1975.

11

language of the usury statutes and determined that the Petitioners did not allege facts that state a cognizable claim under § 12-121.

In addition to the plain language of § 12-101(f), the plain language of § 12-121 fortifies the conclusion that the General Assembly either declined to include assignees within the ambit of the prohibition on inspection fees or failed to update the language of the statute to reflect the state of the secondary mortgage market. The General Assembly could have easily updated the definition of "lender" in § 12-101(f) to include assignees. Moreover, the General Assembly could have inserted language including assignees directly into the text of § 12-121. These are policy determinations made by the General Assembly. It is not the role of this Court to speculate as to what policy decision the General Assembly sought to implement when the plain language of § 12-121 unambiguously spells it out for us.

Section 12-121 was enacted in 1986 and was proposed as legislation in response to the 1986 Report of the Task Force on Real Property Closing Costs, which made "seven major recommendations to reduce Maryland's substantial closing costs." *See* Task Force on Real Property Closing Costs, 1986 Report (Jan. 1986).[7] The language ultimately enacted by the General Assembly is devoid of any reference to "assignees" of a mortgage originator. The history of the secondary mortgage industry suggests that the General Assembly did not intend to include assignees in the definition of a "lender" when it enacted § 12-101(f), and the General Assembly was well aware of the scope of the secondary

---

[7] The 1986 Report of the Task Force on Real Property Closing Costs is available in the archives of Maryland task force reports at the Thurgood Marshall State Law Library.

12

mortgage market when it enacted § 12-121 in 1986.  Indeed, at the time that § 12-121 was enacted, the General Assembly frequently used different terms to differentiate between actors in the primary and secondary mortgage industries.  For example, the legislature included "assignee" to the definition of "lender" in Md. Code (1975, 2013 Repl. Vol.), Com. Law ("CL") § 12-109.2, which only applies for the purposes of that section,[8] and was enacted *on the same day* as § 12-121.  *See* CL § 12-109.2(a)(3) (defining "Lender" as "includ[ing] a lender *and assignee* of a lender." (emphasis added)); *see* 1986 Md. Laws, ch. 628.

This Court has explicitly stated that when the "legislature uses different words . . . it usually intends different things."  *Toler v. Motor Vehicle Admin.*, 373 Md. 214, 223 (2003); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) ("[A] material variation in terms suggests a variation in meaning.").  The General Assembly similarly included mortgage servicers within the definition of "mortgage lender" in 1989 when it enacted § 11-501(j)(1) of the Financial Institutions

---

[8]  Section 12-109.2(a)(3) defines "lender" only for the purposes of the following prohibitions on handling escrow accounts:

> (b)(1) Funds in any escrow account shall be kept separate from and may not be commingled with the funds of the lender.
> > (2) A lender may place escrow funds received in connection with more than one mortgage into a single escrow account.
> > (3) In the event of the bankruptcy of the lender, any escrow funds placed in any escrow account under this section may not be considered to be part of the bankrupt estate of the lender.
> (c) A lender may not impose a collection fee or service charge on the maintenance of an escrow account on a first mortgage.

CL § 12-109.2(b), (c).

Article. Md. Code. (1980, 2020 Repl. Vol.), Fin. Inst. ("FI") § 11-501(j)(1); *see* 1989 Md.

Laws, ch. 476. Section 11-501 of the Financial Institutions Article defines "[m]ortgage

lender" to "mean[] any person who: (i) [i]s a mortgage broker; (ii) [m]akes a mortgage loan

to any person; or (iii) [*i*]s *a mortgage servicer*." FI § 11-501(j)(1) (emphasis added). This

language, as well as that used in CL § 12-109.2, demonstrates that the General Assembly

knew how to differentiate between mortgage originators, assignees, and servicers when it

enacted § 12-121. If the General Assembly had intended to include assignees of a mortgage

originator or mortgage servicers within the prohibition on inspection fees in § 12-121,

undoubtedly, it would have explicitly done so.

Just as the General Assembly did in enacting CL § 12-109.2 and FI § 11-501(j)(1),

it could have included assignees and mortgage servicers within the ambit of the inspection

fee statute by identifying them in the language of § 12-121 or by amending the definition

of "lender" in § 12-101(f). The General Assembly did neither and this Court is now tasked

with interpreting two statutes that make no reference whatsoever to assignees of a mortgage

originator. When we are presented with unambiguous statutory language, it is our role to

apply the unambiguous text by interpreting what the General Assembly intended at the

time that the statute was enacted. *See* Scalia & Garner, *supra* at 78 ("Words must be given

the meaning they had when the text was adopted."); *see also United States v. Rabinowitz*,

339 U.S. 56, 70 (1950) (Frankfurter, J., dissenting) ("Words must be read with the gloss of

the experience of those who framed them.").

In our first opportunity to directly address whether assignees are included within the

definition of "lender" in § 12-101(f), the Majority conclusively determines that assignees

14

who did not make Ms. Kemp's loan are entities "who make[] a loan" under Subtitle 1 of Title 12. Maj. Op. at 26. The Majority makes this determination even though the General Assembly (1) did not include assignees within the definition of "lender" in § 12-101(f); and (2) only provided that a "lender" is subject to § 12-121. Based on the General Assembly's differentiation between different mortgage actors in its enactments, the plain language of the usury statutes indicates that the General Assembly intended only to include mortgage originators and would have updated the statute had it intended otherwise. The correct course of action for the Court is to apply the text as it is written, while alerting the General Assembly "that there may be compelling policy reasons" to treat mortgage assignees the same as those who make loans and are subject to the inspection fee statute. *See In re S.K.*, 466 Md. 31, 57 (2019). For now, the circumstance is that in spite of compelling policy reasons that may exist in *today's* mortgage market, the legislative history makes it clear that, although the General Assembly understood that mortgages were subject to assignment, it did not deem it necessary to include assignees who do not make loans in the language of §§ 12-101(f) and 12-121.

**B.** ***The History of the Secondary Mortgage Market in 1975 Confirms the Circuit Court's Plain Language Interpretation of Subsection 12-101(f).***

As stated above, the definitional section of the usury and interest subtitle, § 12-101, was added in 1975 as a part of the recodification of Maryland's commercial laws into the Commercial Law Article. *See* 1975 Md. Laws, ch. 49. Subsection 12-101(f), as it was drafted in House Bill 26 and enacted in 1975, defined "lender" as "a person who makes a loan under this subtitle." *Id.* The chapter laws for subsection 12-101(f) include a Revisor's

15

Note that reads: "This subsection is new language added to indicate that, in this subtitle, the term 'lender' relates only to a person who makes a loan under the provisions of this subtitle and not, for example, under any other credit law." *Id.* A second Revisor's Note that accompanied chapter 49 uses similar language to explain that a "borrower" "relates only to a person who borrows money" under subtitle 1 of Title 12. *Id.*

The provisions of House Bill 26 were enacted before the General Assembly began retaining bill files in 1976, and the legislative history for enactments prior to that year is typically sparse.[9] Notwithstanding the inclusion of the Revisor's Notes, House Bill 26 is no different. The Fiscal and Policy Note for the bill focuses on its broad purpose, which was to "revise, restate, and recodify the laws of this State relating and pertaining to commercial and related transactions and activities[.]" Fiscal and Policy Note for H.B. 26 (1975). The Court of Special Appeals and the Majority contend that the Revisor's Note to the definition of "lender" demonstrates that the General Assembly's purpose in enacting this definition was to differentiate between lenders who make loans under Subtitle 1, rather than other subtitles of Title 12. But while the Revisor's Note may be indicative of the

---

[9] *See Waterman Fam. Ltd. P'ship. v. Boomer*, 456 Md. 330, 341–42 (2017) ("The key provisions of the statute were enacted before the General Assembly began to retain bill files in 1976 and thus we do not have the benefit of the types of legislative materials that are available for more recent legislation."). Comprehensive legislative bill files were generally hit-or-miss from 1976 to 1995, and "the volume of [legislative history] materials varie[d] markedly from one bill to another[.]" Jack Schwartz & Amanda Stakem Conn, *The Court of Appeals at the Cocktail Party: The Use and Misuse of Legislative History*, 54 Md. L. Rev. 432, 441 (1995). The Maryland General Assembly's website first debuted in 1996 and has provided a more comprehensive record of legislative history documents including the bills, amendments, roll call votes, and fiscal and policy notes for each bill. *See* Maryland Department of Legislative Services, *Under the Dome: The Maryland General Assembly in the 20th Century*, 264–66 (2001).

General Assembly's purpose in adding the definition of "lender" to Subtitle 1, it does not unquestionably confirm the Majority's reading of the statute.

This is particularly so in light of the status of the secondary mortgage industry in the year that House Bill 26 was enacted by the General Assembly. The Majority spends considerable time and relies heavily on the common law premise that an assignee of a loan takes no greater rights than the assignor. *See* Maj. Slip Op. at 5, 22, 29 ("[U]nder Nationstar's argument, the Legislature implicitly abrogated the longstanding common law rule that an assignee of a loan succeeds to the same rights and limitations as its assignor[.]"). The Majority correctly notes that "[i]t has long been understood that a mortgage may be assigned." Maj. Slip Op. at 5. The Majority is also correct in pointing out that "[u]nder the common law, an assignee generally has the same rights and responsibilities as its assignor." *Id.* (citing *Univ. Sys. of Md. v. Mooney*, 407 Md. 390, 411 (2009)).

The Majority's focus on these points, however, is a red herring. The General Assembly did not abrogate the common law understanding of an assignee's rights in enacting § 12-101(f). Nor does interpreting the plain language of that section as only applying to mortgage originators impliedly abrogate the common law. Fannie Mae and Seterus (now Nationstar), as Fannie Mae's agent, received the exact same rights under the deed of trust as were afforded to the original mortgagor, Countrywide. Ms. Kemp's deed of trust provided:

> Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited

to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. **Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.**

(Emphasis added). These are the rights, or parameters, that applied first to Countrywide, and later to Fannie Mae and Nationstar. Included in these rights was the requirement that the mortgagor not act in a way that is "expressly prohibited by" the deed of trust or "[a]pplicable [l]aw," which includes the usury laws. Just because the "[a]pplicable [l]aw, or statutory rights of the assignees in this case differed from that applicable to Countrywide does not mean that the rights assigned to Fannie Mae and Nationstar under the deed of trust were any different than those originally granted to Countrywide. *All parties involved* with Ms. Kemp's mortgage—Countrywide, Fannie Mae, or Nationstar as Fannie Mae's agent— had the *same* right to charge any fee that was not expressly prohibited by the deed of trust or the usury statutes, *i.e*., applicable law.

While deeds of trust have long been assignable under Maryland law, and while assignees may generally only receive equal rights to the assignor, the be-all-and-end-all here is the text of the usury statutes and the General Assembly's intent in enacting §§ 12-101(f) and 12-121. In its interpretation, the Majority failed to consider the nascent origins of the modern secondary mortgage industry in the mid-1970s, which inform the interpretation of the statute's text and failed to consider whether the issue presented in this case would have even been on the General Assembly's radar at the time.

Although a small secondary mortgage market existed at that time, the current state of the secondary mortgage market and the use of drive-by inspections by secondary

18

mortgage actors could not have been contemplated by the General Assembly. Thus, an exploration of the history of the secondary mortgage market is of assistance in determining the intent of the General Assembly when it determined the definition of a "lender" in § 12-101(f).

As a threshold matter, this Court explained how the secondary mortgage market operates in *Blackstone v. Sharma*. 461 Md. 87, 137 (2018). The modern "'mortgage marketplace,' or 'mortgage industry' encompasses a 'primary and secondary mortgage market' that requires securitization." *Id.* (quoting Robin Paul Malloy, *Mortgage Market Reform and the Fallacy of Self-Correcting Markets*, 30 Pace L. Rev. 79, 82 (2009)). The primary mortgage market includes lenders who provide home loans to consumers in the marketplace, often with the intent to "sell the mortgages that they originate" to enhance liquidity (to make more loans and offer more attractive loan products) and reduce risk (by diversifying their investment portfolio). *Id.* (quoting Malloy, *supra* at 95). Entities that participate in the secondary mortgage market "buy and sell loans and loan participations, as well as package loans into pools for securitization[,]" which involves investment banks bundling together groups of purchased mortgages into a "special purpose vehicle" of which the income rights are sold to other investors. *Id.* at 137–38 (emphasis omitted) (quoting Malloy, *supra* at 96) (quoting *Anderson v. Burson*, 424 Md. 232, 237 (2011)).

With this background in mind, it is important to recognize that the robust secondary mortgage market that exists today did not exist in 1975. The process of obtaining a mortgage when the definition of "lender" in § 12-101(f) was enacted by the General Assembly involved obtaining a conventional mortgage loan from a local financial

19

institution, such as a savings and loan company or bank, and generally "made the price of a new home unaffordable for many families." Peter M. Carrozzo, *Marketing the American Mortgage: The Emergency Home Finance Act of 1970, Standardization and the Secondary Market Revolution*, 39 Real. Prop. Prob. & Tr. J. 765, 769 (2005). The mortgages provided by neighborhood banks and savings institutions were financed by money deposited by community members into those institutions. *Id.* at 766 (citing Michael H. Schill, *The Impact of the Capital Markets on Real Estate Law and Practice*, 32 J. Marshall L. Rev. 269, 270 (1999)). The mortgage money available to the community, therefore, was directly connected to the amount of savings provided to local banks by members of the community, and each mortgage was held in the local bank's portfolio until the property was sold. *Id.* Because mortgage money was scarce and dependent on money held in local banks, "higher interest rates for borrowers, greater difficulty in obtaining loans, and ultimately, a depressed real estate market" were the norm. *Id.*

Despite the longstanding local nature of the mortgage lending industry, a secondary mortgage market that included the securitization of conventional mortgage loans did not mature until the 1970s. *See* Alan J. Blocher, *Due-On-Sale in the Secondary Mortgage Market*, 31 Cath. U. L. Rev. 49, 49 (1981). Although conventional mortgage loans were not sold on the secondary market until the 1970s, the federal government began backing locally originated mortgages beginning in the 1930s. Specifically, the origin of the secondary mortgage market stems from creation of the Federal Housing Administration ("FHA") by Congress in 1934. Robin Paul Malloy, *The Secondary Mortgage Market—A Catalyst for Change in Real Estate Transactions*, 39 Sw. L. J. 991, 992 (1986) (citing P.

20

Goldstein, *Real Estate Transactions–Cases and Materials on Land Transfer, Development and Finance* 308–09 (1981)).

At that time, Congress directed the FHA, and later the Veterans Administration ("VA"),[10] to develop mortgage insurance programs that provided security—specifically, a guaranteed means of repayment—for local mortgage originators. *Id.* at 992–93. Notwithstanding these programs, only a small proportion of mortgages consisting of FHA and VA loans were insured by government agencies. *Id.* at 993. Four years after the creation of the FHA, in 1938, Congress created Fannie Mae to advance a variety of policy goals aimed at providing liquidity to support "continued marketability of FHA and VA loans with fixed interest rates[,] . . . to counterbalance . . . the cyclical effects of general business recessions . . . [and to] provide[] assistance for special housing projects that were unable to generate sufficient private investment[.]" *Id.* Notably, Fannie Mae played no role in purchasing and securitizing conventional mortgage loans for sale on the secondary mortgage market.

In 1968, thirty years after Congress created Fannie Mae, it divided Fannie Mae into the Government National Mortgage Association ("Ginnie Mae") and a second entity that was still named Fannie Mae but became a federally chartered corporation held by private shareholders. *Id.* (citing Federal Home Loan Mortgage Corporation, Pub. No. 67, *The Secondary Market in Residential Mortgages* 10–12 (J. Pheabus ed. 1983)). The separate

---

[10] Congress approved, and the VA provided, a similar loan insurance program to the FHA's program beginning in 1944. Malloy, *The Secondary Mortgage Market—A Catalyst for Change in Real Estate Transactions*, *supra* at 992.

entities had fundamentally different objectives; Ginnie Mae was established under the Department of Housing and Urban Development ("HUD") and was responsible for special assistance and housing support programs while Fannie Mae's primary focus was to buy FHA and VA loans to increase the liquidity of local loan originators. *Id.* at 993–94.

As different regions in the United States began to experience rapid growth, however, and the development of real estate increased, local banks and savings institutions in these regions lacked sufficient funds to keep up with the increased demand for mortgage loans. *Id.* at 994. In response, Congress created the Federal Home Loan Mortgage Corporation ("Freddie Mac") in 1970 by enacting the Emergency Home Finance Act, 12 U.S.C. §§ 1451–1459. *Id.* Freddie Mac's purpose, in contrast to its predecessor agencies and for the first time in the secondary mortgage industry, was to purchase conventional mortgages from local banks and savings institutions. *See id.* n.19 ("[Freddie Mac] is owned by the twelve member Federal Home Loan Banks, which act as the central banks for the nation's thrift industry consisting primarily of savings and loan institutions.").

Fannie Mae was also authorized by Congress to purchase conventional loans beginning in 1970, in addition to its previous portfolio of FHA and VA loans. *See* Fannie Mae, *Fannie Mae Charter*, https://www.fanniemae.com/about-us/corporate-governance/fannie-mae-charter [https://perma.cc/LQ8L-2RXF]. With Fannie Mae's newfound ability to purchase conventional mortgage loans, that agency and Freddie Mac "develop[ed] uniform standards to facilitate the purchase and sale of mortgages in the secondary mortgage market and thereby attract new sources of investment capital to the housing market." Malloy, *The Secondary Mortgage Market—A Catalyst for Change in*

22

*Real Estate Transactions*, *supra* at 994 (citing Raymond A. Jensen, *Mortgage Standardization: History of Interaction of Economics, Consumerism and Governmental Pressure*, 7 Real Prop. Prob. & Tr. J. 397, 397–435 (1972)).

Significantly, however, the creation of this newfound secondary mortgage market for conventional loans was "a new beginning" in the early 1970s. *See* Jansen, *supra* at 399. By 1972, there was still a significant "emphasis on local practice in the real estate field." *Id.* at 398. It wasn't until September 21, 1977, that Bank of America transacted "[t]he first private-label mortgage-securitization deal," which was worth $100 million.[11] William W. Bratton & Adam J. Levitin, *A Transactional Genealogy of Scandal: From Michael Milken to Enron to Goldman Sachs*, 86 S. Cal. L. Rev. 783, 799 n.44 (2013). With the benefit of hindsight, Alan J. Blocher, former Vice President of Mortgage Programs and Services at Freddie Mac, noted in 1981 that "[a]s recently as a few years ago, these subjects would have been of interest only to real estate professionals and a handful of legal scholars." Blocher, *supra* at 49. Blocher continued by recognizing that the maturation of the secondary mortgage market had only "assumed greater importance" in the 1980s "because of the state of the home mortgage business" at that time. *Id.* By the mid-1980s, the rapid development of the secondary market seemed "likely to be regarded as one of the most important developments in real property and finance law" during that decade. Malloy, *The*

---

[11] Bratton and Levitin explain that a "private-label mortgage securitization" involves the purchase of securitized mortgages by an entity other than Fannie Mae, Freddie Mac, or Ginnie Mae. Bratton & Levitin, *supra* at 799 n.44.

23

*Secondary Mortgage Market—A Catalyst for Change in Real Estate Transactions*, *supra* at 991.

Mindful of this history, we glean from the various academic sources cited the following observations. The General Assembly likely considered the existence of the secondary mortgage market in 1975 and, as the Majority correctly states, understood that certain loans were subject to assignment. Such an observation is reinforced by the fact that the General Assembly included the word "assignee" in its 1975 enactment of Md. Code (1975, 2013 Repl. Vol.), Com. Law ("CL") § 12-112 and its understanding that mortgages could be subject to "subsequent assignment."[12] Even so, the legislative history of § 12-101(f) and the history of the secondary mortgage industry reveals that the language used by the General Assembly comports with its experience with and knowledge of the mortgage industry at the time that it enacted House Bill 26.

The drafters of § 12-101(f) were not clairvoyant. The General Assembly's understanding of how the mortgage industry operated—*i.e.* who held the majority of mortgages on real property—was that of a legislative body sitting in 1975. This was only five years after Fannie Mae began adding conventional loans to its portfolio and two years *before* the first private purchase of securitized mortgage notes occurred. Thus, the threshold question here is whether the General Assembly considered that most subsequent mortgage notes would go on to be bought and sold on the secondary market by entities who

---

[12] This alone signals that the General Assembly did not intend to include assignees of a mortgage originator within the definition of "lender" in § 12-101(f) and would have included such language if it did.

24

do not make loans.  The answer to this question is "no."  The unambiguous text enacted by the General Assembly aligns with its understanding of the mortgage industry in 1975, and was not based on clairvoyance, *i.e.*, knowledge of the significant impact that mortgage securitization would later have on the usury statutes' operation.

The Majority sees fit to attach today's understanding of the secondary mortgage industry to the text of House Bill 26 as a justification to consider the unambiguous plain text of the usury statutes as "illogical."  In light of the history of the secondary mortgage industry and its status in 1975, however, this Court should not stray from the unambiguous text enacted by the General Assembly at that time.  The General Assembly did not intend for secondary mortgage industry actors to be subject to the prohibition on inspection fees set out in § 12-121.  This Court should recognize that the words of the statute should be read according to their ordinary plain meaning and that the plain language of the statute reflects the intent of the General Assembly, which is confirmed by the statute's legislative history and the history of the mortgage industry.

## C.     *The Court of Special Appeals Misapplies this Court's Caselaw and Misinterprets the History of Section 12-121.*

The Court of Special Appeals relies too heavily on this Court's decisions in *Taylor* and *Thompkins* and improperly expands those cases to reinforce its incorrect interpretation of the usury statutes.  In holding that § 12-121 applies to assignees of a mortgage originator, the Court of Special Appeals felt "constrained by *Taylor's* conclusion that, based on the General Assembly's removal of the phrase '*as a condition of the loan*' from CL § 12-121, the legislature intended the prohibition against property inspection fees to extend

throughout the life of the loan, regardless of whether it was assigned." *Kemp*, 248 Md. App. at 25 n.11. Moreover, the Court of Special Appeals found that this Court's application of the Secondary Mortgage Loan Law ("SMLL") to assignees in *Thompkins* supports Ms. Kemp's argument that § 12-121 also applies to assignees of a mortgage originator. Neither case relied on by the Court of Special Appeals addresses the issue that is before the Court in this case nor do the cases override the General Assembly's plainly stated intent.

    *1.*     Taylor v. Friedman.

In *Taylor*, this Court considered "the construction of § 12-121" in determining whether the statutory prohibition on inspection fees applies to only those "assessed as part of closing costs," or whether the prohibition lasts "throughout the life of the loan." 344 Md. at 577, 581–82. The plaintiff in that case, Larry G. Taylor, defaulted on a residential mortgage that was held by Margaretten & Company, Inc. ("Margaretten"). *Id.* at 574–75. During the life of Mr. Taylor's loan, Margaretten was acquired by Bank of America, F.S.B., which was renamed "BA Mortgage, a division of Bank of America, F.S.B." ("BA Mortgage").[13] *Id.* at 575. From time to time, Mr. Taylor was delinquent in paying his mortgage payment and, whenever his account was more than forty-five days delinquent, BA Mortgage initiated an inspection of Mr. Taylor's property. *Id.* BA Mortgage charged $10 to Mr. Taylor's account after each inspection. *Id.*

_____

[13] The Court in *Taylor* referenced Margaretten, BA Mortgage, and the substitute trustees named as defendants in that case collectively as "Lender." *Taylor*, 344 Md. at 575 ("We shall refer to the entity that held the note at any given time as 'Lender.'"). The Court did not, at any point, consider the fact that the entity holding Mr. Taylor's mortgage was an assignee of the originator of the loan.

26

In 1993, Mr. Taylor wrote to BA Mortgage claiming that the inspection fees applied to his account were illegal under § 12-121 and seeking a refund for all previous inspection fees levied against him. *Id.* Mr. Taylor ceased making payments on the loan when BA Mortgage failed to respond or failed to meet Mr. Taylor's demands. *Id.* BA Mortgage caused five inspections to be conducted on Mr. Taylor's property, charged Mr. Taylor $50 in inspection fees, and ultimately initiated foreclosure proceedings in the Circuit Court for Anne Arundel County. *Id.* at 575–76.

Before this Court, Mr. Taylor argued that the plain language of § 12-121 unambiguously prohibited the inspection fees that were levied on his account and that such a prohibition survived for the duration of the loan. *Id.* at 581. In contrast, the respondents in *Taylor* maintained that the statutory language qualifying that only inspection fees imposed "in connection with a loan" are prohibited was ambiguous and required this Court to consider the statute's legislative history. *Id.* at 581–82. Because § 12-121 was suggested by the Report of the Task Force on Real Property Closing Costs created by Governor Harry R. Hughes, the respondents argued that the General Assembly only intended to prohibit inspection fees in connection with real property closing costs, and the inspection fees levied in connection with Mr. Taylor's default were not prohibited. *Id.* at 582.

This Court agreed with Mr. Taylor and grounded our holding in the plain language of the statute. In determining that § 12-121 applies throughout the life of a mortgage, we analyzed the statute's plain language and determined that inspection fees were only proper under the two exceptions set out in subsection 12-121(c). *See id.* at 583–84. We acknowledged that "[t]here is no question but that the background for the creation of the

27

Commission was a concern over real property closing costs." *Id.* at 582. However, because the statute only permits property inspections "to ascertain completion of . . . (1) [c]onstruction of a new home; or (2) [r]epairs, alterations, or other work required by the lender[,]" and not as a result of a lender's default, we determined that relevant legislative history did not override the statute's plain language. *Id.* at 574, 583–84.

The Court of Special Appeals read *Taylor* as supporting its use of legislative history to override the plain language definition of "lender" in § 12-101(f), but *Taylor* was a straightforward case of statutory interpretation in which this Court unsurprisingly grounded its holding in the unambiguous text. *Id.* at 584 ("[W]e conclude that the legislative history does not so clearly demonstrate a purpose to limit the prohibition of § 12-121 to closing costs as to override the plain language of the statute."). *Taylor* does not endorse the use of legislative history to override the plain language of § 12-121, as the Court of Special Appeals did in this case. In fact, our holding in *Taylor* endorses the opposite approach. Although the legislative history in *Taylor* evidenced a concern by the General Assembly about closing costs, we determined that the legislative history was not so conclusive as to warrant a departure from the text of the statute. In contrast, the legislative history here *supports* the unambiguous plain language of the statute and compels the Court, as it did in *Taylor*, to apply the text as it was enacted.

The Court of Special Appeals also determined that, because the *Taylor* Court applied § 12-121 to an assignee, affirming the circuit court's dismissal of Ms. Kemp's claims would "contradict the Court of Appeals' application of [§ 12-121] to an assignee in *Taylor*." *Kemp*, 248 Md. App. at 28. However, nothing in *Taylor* is contradictory to the

28

circuit court's plain language interpretation of the usury statutes. Nowhere in *Taylor* did the Court address the applicability of § 12-121 to assignees of a mortgage originator or state that assignees are subject to the prohibition on assessing inspection fees. While the Court in *Taylor* happened to apply § 12-121 to an assignee in that case, it gave no consideration to the applicability of the prohibition on inspection fees to assignees and did not analyze the scope of the word "lender" in § 12-101(f).

Just last year, Judge Paula Xinis of the United States District Court for the District of Maryland cogently noted that "even a cursory reading of *Taylor* reveals that the Court of Appeals never addressed whether a 'lender' includes mortgage assignees." *See Flournoy*, 2020 WL 1285504, at *6 ("[T]he Court merely assumed without deciding that the mortgage holder was a 'lender.' *Taylor* simply does not reach whether a secondary mortgage holder is a 'lender,' and again the Court is not alone in concluding as much.").[14] Put plainly, the *Taylor* Court did not address the applicability of § 12-121 to assignees because that issue was not before the Court and its holding does not compel this Court to depart from the text of the usury statutes.

2.      Thompkins v. Mountaineer Investments, LLC.

The Court of Special Appeals also improperly grounded its interpretation of the usury statutes on this Court's holding in *Thompkins*, which involved a statute not at issue

---

[14] *See also Roos*, 2019 WL 4750418, at *5 (quoting the court's holding in *Suazo* that "*Taylor* does not stand for the proposition that assignees may be held liable under 12-101(f)."); *Robinson*, 2019 WL 4735431, at *9 ("*Taylor* does not stand for the proposition that assignees may be held liable under § 12-101(f)."); *Suazo*, 2019 WL 4673450, at *10 ("*Taylor* does not stand for the proposition that assignees may be held liable under § 12-101(f).")

here. 439 Md. 118 (2014). In *Thompkins*, Marshall and Antoinette Thompkins obtained a secondary mortgage loan on their residence. *Id.* at 123. That mortgage was subsequently assigned to another entity before finally being assigned to Mountaineer Investments, LLC ("Mountaineer"). *Id.* Three years after paying off the secondary loan, Mr. and Ms. Thompkins brought suit against Mountaineer claiming that under the Uniform Commercial Code ("UCC"), the SMLL, and the common law, it was responsible for violations perpetrated by the original lender at the time of the loan transaction. *Id.* This Court was therefore tasked with determining whether "an assignee of a secondary mortgage loan is responsible for certain statutory violations allegedly committed by the original lender when the loan was made." *Id.* at 122.

In analyzing the text of the SMLL, this Court recognized that, much like the usury statutes in this case, the "SMLL itself does not provide that an assignee of a lender is liable for the lender's violations of that statute at the time the loan was made." *Id.* at 131. The text of the SMLL was bereft of any reference to assignees of a loan originator and the Court contrasted the SMLL to other statutes in the Commercial Law Article where the General Assembly saw fit to include assignees within the plain language. *Id.* at 131–32 (citing CL §§ 12-109.2(a)(3), 12-1001(g)(2)(iii) & 12-901(f)(2)(iii)).

Although "the SMLL does not include a specific reference to assignments or assignees[,]" we also considered whether the structure of the statute suggested that the General Assembly intended to subject assignees to liability under the SMLL for violations committed by the loan originator. *Id.* In doing so, we stated in passing that "the statute is not entirely bereft of the notion that a loan may be assigned[]" and found it "unlikely that

30

the General Assembly intended that key ongoing protections of the SMLL . . . could be defeated simply by assigning the promissory note." *Id.* at 132. In making these observations, however, we ultimately relied on the plain language of the statute in holding that the SMLL "itself does not make an assignee directly liable for violations of the statute by the lender in the original loan transaction." *Id.* at 131. Thus, this Court's approach to construing the statute sought to avoid an interpretation "[that] would render the carefully drawn provisions" of the statute meaningless. *Id.* at 138 (internal quotation marks omitted).

*Thompkins*, like *Taylor*, confirms that this Court should apply the plain language of the usury statutes in this case. As explained, *Thompkins* does not stand for the proposition that assignees are subject to the prohibition on inspection fees in § 12-121. In *Thompkins,* this Court did not analyze the applicability of the relevant statutes in this case to assignees and, although it was skeptical that the General Assembly intended for assignees to be able to avoid the SMLL's provisions, it made no such pronouncement about §§ 12-101 and 12-121 of the Commercial Law Article. We did not do so for two reasons. First, the issue in this case was not before the Court. Second, as the Petitioners correctly note in their opening brief, the interest and usury statutes here are distinguishable from the SMLL. *See* Pet'r's Br. at 36. For example, the holders in due course provision in CL § 12-112 *permits* a cause of action against assignees who did not receive the assignment "for a bona fide and legal consideration" or had "notice of any usury" when the loan was created or assigned. CL § 12-112(b). In *Thompkins,* we recognized this difference and used the holder in due course provision as an example as to why the SMLL did not apply to Mountaineer—not for the

31

proposition that the definition of "lender" in subsection 12-101(f) applies to assignees throughout Subtitle 1 of Title 12.

As in *Taylor* and *Thompkins*, this Court should interpret the text of the usury statutes based on the General Assembly's plainly stated intent. Neither case compels the Majority's application of the usury statutes to assignees of a mortgage originator because they do not address the issue at hand, and in both cases, the Court found that the text of the statute governed its interpretation. This is particularly the case where the legislative history relied on by the Court of Special Appeals does not unquestionably confirm its atextual reading of the statutes, and the outcome reached by the circuit court does not lead to illogical results. The bottom line here is that Ms. Kemp did not plead that Nationstar or Fannie Mae make loans. Neither Nationstar nor Fannie Mae "made" Ms. Kemp's loan, therefore they are not lenders under subsection 12-101(f) and are not subject to the prohibition on inspection fees laid out in § 12-121. Because the plain language of the usury statutes is clear and unambiguous, and the relevant legislative history supports the circuit court's plain language interpretation, this Court should affirm the circuit court's dismissal of Ms. Kemp's inspection fee claim for failing to plead facts upon which relief could be granted.

## D.     *The Circuit Court Correctly Dismissed Ms. Kemp's MCDCA Claim.*

Although the Court of Special Appeals departed from the circuit court's reasoning, it correctly affirmed the circuit court's dismissal of Ms. Kemp's MCDCA claim. Under our inspection fee analysis above, Ms. Kemp's MCDCA claim fails because, according to the plain language of §§ 12-121 and 12-101, Nationstar and Fannie Mae had the right to collect inspection fees as assignees of Ms. Kemp's mortgage originator. However, even in

32

light of the Majority's interpretation of the usury statutes, we agree with the Court of Special Appeals' analysis for two reasons. First, as the Court of Special Appeals aptly determined, the MCDCA cannot be used as a sword to challenge the validity of an underlying debt; it regulates only the *methods* that the debt collector uses to collect a debt. Second—even if this Court determines that the MCDCA regulates more than just methods of debt collection—the "knowledge" requirement of § 14-202(8) precludes Ms. Kemp from recovering here.

1. *A Plaintiff May Only Challenge Prohibited Methods of Debt Collection Under the MCDCA, Not the Validity of an Underlying Debt.*

Ms. Kemp contends that Nationstar's act of adding property inspection fees to her modified loan amount violates § 14-202(8) as a "claim, attempt, or threat[] to enforce a right with knowledge that the right does not exist." CL § 14-202(8). But the text and structure of § 14-202 make clear that the General Assembly intended only to prohibit certain methods of collection, not provide a cause of action to challenge the validity of an underlying debt. As such, the Court of Special Appeals correctly determined that "Ms. Kemp identifies no improper method of collection nor any basis on which to conclude that [Nationstar's] capitalization of the property inspection fees into the modified loan was improper." *Kemp*, 248 Md. App. at 37.

In agreeing with Court of Special Appeals' analysis I would ground my interpretation of § 14-202 in the plain language of the statute. Section 14-202 of the MCDCA outlines eleven prohibited acts that a debt collector may not take in the course of collecting an alleged debt and reads:

33

In collecting or attempting to collect an alleged debt a collector may not:

(1) Use or threaten force or violence;
(2) Threaten criminal prosecution, unless the transaction involved the violation of a criminal statute;
(3) Disclose or threaten to disclose information which affects the debtor's reputation for credit worthiness with knowledge that the information is false;
(4) Except as permitted by statute, contact a person's employer with respect to a delinquent indebtedness before obtaining final judgment against the debtor;
(5) Except as permitted by statute, disclose or threaten to disclose to a person other than the debtor or his spouse or, if the debtor is a minor, his parent, information which affects the debtor's reputation, whether or not for credit worthiness, with knowledge that the other person does not have a legitimate business need for the information;
(6) Communicate with the debtor or a person related to him with the frequency, at the unusual hours, or in any other manner as reasonably can be expected to abuse or harass the debtor;
(7) Use obscene or grossly abusive language in communicating with the debtor or a person related to him;
**(8) Claim, attempt, or threaten to enforce a right with knowledge that the right does not exist**;
(9) Use a communication which simulates legal or judicial process or gives the appearance of being authorized, issued, or approved by a government, governmental agency, or lawyer when it is not;
(10) Engage in unlicensed debt collection activity in violation of the Maryland Collection Agency Licensing Act; or
(11) Engage in any conduct that violates §§ 804 through 812 of the federal Fair Debt Collection Practices Act.

CL § 14-202 (emphasis added).

It is immediately noticeable that the plain language of the statute provides no support for Ms. Kemp's preferred interpretation. The introductory phrasing of the statute sets forth the eleven prohibited acts under the requirement that they be made "[i]n collecting or attempting to collect an alleged debt[.]" CL § 14-202. The General Assembly's use of this language indicates that it intended to regulate affirmative actions— *i.e.*, methods—taken by collectors to enforce a debt. And while Ms. Kemp contends that

34

such an interpretation runs contrary to the remedial nature of the MCDCA, this would not be the first instance in which the text of § 14-202 was construed as solely regulating eleven prohibited debt collection methods—all of which are affirmative debt collection practices. *See, e.g.*, *Robinson v. Kekec*, 2018 WL 3387786, at *5 n.8 (Md. Ct. Spec. App. July 11, 2018) ("[T]he purpose of the MCDCA is not to protect consumers against debts or legal disagreements—it protects consumers from unfair debt collection *practices*." (emphasis added)).

In addition to the text, the structure of § 14-202 makes it clear that the General Assembly intended to differentiate between the "underlying 'debt' that the debt collector is attempting to collect and the *methods* used to collect that debt." *Kemp*, 248 Md. App. at 35 (emphasis in original); *accord Chavis v. Blibaum Assocs., P.A.*, 246 Md. App. 517, 528, 530 (2020) ("[Section] 14-202[] is meant to proscribe certain *methods* of debt collection and is not a mechanism for attacking the validity of the debt itself[.]") (emphasis in original); *see also Fontell v. Hassett*, 870 F. Supp. 2d 395, 405 (D. Md. 2012) ("[T]he [MCDCA] focuses on the conduct of the debt collector in attempting to collect on the debt, whether or not the debt itself is valid[.]"). The statute's eleven prohibited acts all relate to debt collection activities and include verbs that comport with the Court of Special Appeals' understanding of the statute, *i.e.*, "Use," "Threaten," "Disclose," "Claim," "Attempt," and "Engage." The General Assembly's word choice here was deliberate; it confirms that the legislature enacted § 14-202 to prohibit various affirmative actions taken in connection with the collection of an alleged debt.

Two Court of Special Appeals cases help us to parse why Ms. Kemp's arguments fail to afford her relief under § 14-202. The Court of Special Appeals looked to its decisions in *Allstate Lien & Recovery Corporation v. Stansbury* and *Mills v. Galyn Manor Homeowner's Association* in rejecting Ms. Kemp's interpretation of § 14-202(8). 219 Md. App. 575 (2014); 239 Md. App. 663 (2018). In both cases, the court determined that the parties subject to the alleged debt could bring a claim under § 14-202(8) because they (1) pleaded facts that challenged an improper method used by a debt collector; and (2) the well plead facts *may* have entitled the plaintiffs relief under the statute.

Specifically, in *Allstate Lien*, the Court of Special Appeals held that "front-loading processing fees and including those fees" as a part of a garageman's lien was a prohibited debt collection method under § 14-202(8). 219 Md. App. at 591. The court's decision in that case rationally flowed from the fact that, under CL § 16-202(c), a garageman's lien "does not encompass 'cost of process' fees." *Id.* at 589–90. The plaintiff in *Allstate Lien* accordingly challenged the ability of the debtor to front-load processing fees as a part of the lien even though those fees—by statute—were not subject to a garageman's lien. The difference between this case and *Allstate Lien* is that § 12-121 does not prohibit a party from capitalizing inspection fees into a modified home loan. In attempting to conjure a claim under § 14-202, Ms. Kemp pleads facts that go directly to the validity of the inspection fees assessed against her. She provides no support as to why the capitalization of those fees into her modified home loan balance is a method of debt collection that is prohibited under § 14-202(8).

36

A similar situation occurred in *Mills*, where the Court of Special Appeals determined that a plaintiff was entitled to proceed under § 14-202(8). 239 Md. App. at 679. In that case, a homeowners' association ("HOA") attempted to collect past-due HOA fees by filing for a lien against the delinquent resident. Significantly, however, the HOA filed the lien *after* the statute of limitations for filing a lien had run. *Id.* The court accordingly determined that, under § 14-202(8), the plaintiff's claims regarding the HOA's attempt to file a lien after the statute of limitations had run challenged an improper method of debt collection, not the validity of the loan. Just as it did in *Allstate Lien*, the Court of Special Appeals in *Mills* found that the plaintiff pleaded facts that challenged an improper debt collection method and entitled the plaintiff to move past the summary judgment stage under § 14-202(8). *Id.*

While making the distinction between methods of debt collection and the underlying debt itself may be an analytically rigorous exercise, I see no reason to read a cause of action into the statute that does not currently exist. The Court of Special Appeals—on numerous occasions—has interpreted § 14-202 by its plain, unambiguous text. The United States District Court for the District of Maryland agreed with such an interpretation and found that "Section . . . 14-202(8) only makes grammatical sense if the underlying debt, expressly defined to include an alleged debt, is assumed to exist, and the specific prohibitions are interpreted as proscribing certain *methods* of debt collection rather than the debt itself." *Fontell*, 870 F. Supp. 2d at 405 (emphasis in original). And although the authority cited above is not binding on this Court, it serves as a strong indicator that the text enacted by the General Assembly unambiguously demonstrates its plainly stated intent. Therefore,

37

this Court should apply the text of § 14-202 as it is written and decline to read a cause of action into the statute that does not exist.

2.      *The Petitioners Did Not Have "Knowledge" that the "Right" to Assess Inspection Fees Does Not Exist For Assignees of a Mortgage Originator.*

Even under the Majority's view that the MCDCA provides a cause of action for a plaintiff to challenge the validity of an underlying debt, the circuit court's dismissal of Ms. Kemp's MCDCA claim is still the proper outcome. The statute's prohibition on [c]laim[ing], attempt[ing], or threaten[ing] to enforce a right . . . that . . . does not exist" requires that the perpetrator do so "*with knowledge*." CL § 14-202(8) (emphasis added). Therefore, for Ms. Kemp's claim to survive at the motion to dismiss stage, she had to plead *some* facts demonstrating that the Petitioners knew that the inspection fees assessed under § 12-121 were unlawful. I am unconvinced that the Petitioners had the requisite "knowledge" to be held liable under § 14-202 because: (1) the text of § 12-121 suggests that it only applies to loan originators; (2) every court that has considered this issue, besides the Court of Special Appeals in this case, has held that § 12-121 does not apply to assignees of a mortgage originator; and (3) no authority supports Ms. Kemp's contention that capitalizing inspection fees is a "right" that does not exist.

Although the Majority disagrees, and as explained more fully *supra*, the text of §§ 12-101 and 12-121 demonstrates that it does not apply to assignees of a mortgage originator. The plain language of the usury statutes makes no reference whatsoever to assignees; therefore, the statutes did not put Petitioners on notice that they may be prohibited from assessing inspection fees under §12-121. Although the Petitioners cannot

38

"escape liability . . . merely because they didn't bother to make themselves aware" of the statutes' applicability to assignees of a mortgage originator, that is not the case here. *Fontell*, 870 F. Supp. 2d at 408. Every court that has addressed the plain language of § 12-121—including the circuit court in this case—has determined that the text unambiguously illustrates that assignees are not subject to the statute in its current form. The Majority's determination that the Petitioners knew that they were subject to § 12-121 renders the "knowledge" requirement in § 14-202(8) toothless and ignores the requirement that "[t]he well-pleaded facts setting forth the cause of action be pleaded with sufficient specificity[.]" *RRC Northeast, LLC. v. BAA Md., Inc.*, 413 Md. 638, 644 (2010) (citing *Adamson v. Corr. Med. Servs., Inc.*, 359 Md. 238, 246 (2000)) ("Bald assertions and conclusory statements by the pleader will not suffice."). The facts pleaded in Ms. Kemp's amended complaint provide conclusory allegations that fail to demonstrate that the Petitioners acted with the requisite knowledge and do not entitle her MCDCA claim to survive Petitioners' motion to dismiss.

The Majority's determination that Ms. Kemp pleaded facts sufficient to challenge an improper debt collection method insinuates that she also pleaded facts sufficient to demonstrate that Petitioners knew capitalizing the inspection fees into Ms. Kemp's loan was a "right" that did not exist. Ms. Kemp pleads no such facts. Because the assessment of a property inspection fee by an assignee does not violate CL §12-121, Ms. Kemp's complaint did not properly allege that capitalizing the inspection fees into her loan was a "right" that did not exist, and the complaint failed to allege that Petitioners had "knowledge" that the "right" did not exist. For these reasons, this Court should affirm the

39

judgment of the Court of Special Appeals and hold that the circuit court properly dismissed

Ms. Kemp's MCDCA claim.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/43a20cn.pdf